Bernard GAITEN, Petitioner,

v.

Donald W. STAHL, and the State of North Carolina, Respondents.

Civ. A. No. 2811.

United States District Court,
W. D. North Carolina,
Charlotte Division.

June 3, 1971.

---

**416**

Richard F. Harris, III, Hicks & Harris, Charlotte, N. C., for petitioner.

Robert Morgan, Atty. Gen., and Charles A. Lloyd, Staff Atty., State of N. C., Raleigh, N. C., for respondents.

### MEMORANDUM OF DECISION AND ORDER

McMILLAN, District Judge.

Petitioner, Bernard Gaiten, is presently detained at the Mecklenburg County Jail in Charlotte serving a sentence of five years for common law robbery imposed November 19, 1969, in Mecklenburg County Superior Court upon his conviction by a jury. He appealed his conviction to the North Carolina Court of Appeals which found "No error," State v. Gaiten, 8 N.C.App. 66, 173 S.E. 2d 646 (1970). Subsequently, the Supreme Court of North Carolina affirmed the conviction, State v. Gaiten, 277 N.C. 236, 176 S.E.2d 778 (1970). Gaiten, having exhausted available state post-conviction remedies, now petitions this court for writ of habeas corpus.

Petitioner's sole claim of unconstitutional detention is that the exclusion of certain cross-examination testimony of the prosecuting witness, challenging the manner in which and the time when the witness identified the petitioner before trial, violated the petitioner's Sixth Amendment right to confront witnesses against him and his right to submit them to cross-examination in the presence of the jury.

### FINDINGS OF FACT

On direct examination, the prosecuting witness, Henry J. Reeves, identified the petitioner as being one of four

or five persons who robbed him in Charlotte on the night of July 6, 1969 (R. p. 11). Subsequently, Reeves testified that he identified the petitioner, as well as certain stolen property, *at the Hickory Police Department* on *July 14, 1969.* Defense counsel undertook to cross-examine about this identification, and the following exchanges took place (R. pp. 20–27; emphasis added):

RECROSS EXAMINATION By Mr. Harris:

I identified this man (the defendant, Bernard Gaiten) as being the person that robbed me after the incident. Several days later. *The 14th of July. At Hickory.*

Q. And what was the means of identification?

MR. LILES: Objection.

COURT: Sustained as to the form of the question.

EXCEPTION NO. 12

Q. What was the procedure you used for you to identify this person?

MR. LILES: Objection

COURT: All right. Ladies and gentlemen, you may go to your jury room.

EXCEPTION NO. 13

(Whereupon the jury retired to their jury room)

COURT: *All right. Put it in the record.* Do you want to conduct a voir dire on the question of identification of this defendant, Mr. Harris?

MR. HARRIS: *No sir. I don't want to conduct a voir dire.* I would like for his answers to be placed in the record. *I am merely cross examining this witness to determine when and how he identified him.*

COURT: Are you contending that there was a lineup?

MR. HARRIS: No sir. I don't know. Let's let the witness answer.

COURT: *All right, go ahead, put it in the record.*

DISCUSSION OFF THE RECORD

Q. (By Mr. Harris) What was the procedure used in your identification of this defendant at sometime subsequent to the date this offense occurred, about 11:00 p. m., July 6th 1969?

MR. LILES: Objection

COURT: Overruled

A. The first identification procedure was one where I was shown several photographs of individuals.

Q. And where was that?

A. This was in Hickory, but, now, I wasn't specifically identifying anyone then. This was just a matter of information. I wasn't shown these photographs as an identification per se. I was just being informed of the persons who were involved in attempting to use articles that belonged to me.

Q. Now, who were the persons that were showing you these photographs?

MR. LILES: Objection

COURT: Overruled

A. I—

COURT: If he knows.

A. I could refer to this. I think I've got their names. No, I don't have any names.

Q. Were they police officers?

A. Yes.

Q. Were they Hickory police officers?

A. I'm not really sure I understand his first question. I'm really answering but I am—I was given information concerning the fraudulent use of a credit card in Hickory. Now, when I appeared in a hearing here, I identified this man by means other than the one I was shown in Hickory. And I'm not real sure if I understand which one he's asking me about. See, he asked me about the first identification after this happened and not necessarily the one related to this specific strong-armed incident.

Q. The first incident in Hickory, the one you've been testifying to, let's continue along that trend. Now, were these

police officers from Hickory or from Charlotte?

A. Hickory. The thing I'm not sure of, your Honor, is that *I don't remember if I was just shown a photograph of the man who was charged with the incident in Hickory.* I believe I was only shown one photograph in Hickory and this was of the man that was charged in the incident. *I don't really believe that I was shown a picture of this man.*

COURT: Is that your testimony?

A. My testimony is that I'm not sure if this man was included in the photographs in Hickory, so I wouldn't say that this was the first time that I identified him. *The first time that I recall identifying him for sure was when I appeared at the hearing and I saw him in person.*

COURT: All right.

Q. And which hearing was this?

A. This was—

Q. In Mecklenburg County?

A. Yes.

Q. In District Court?

A. No. It was in the court up by the old police station.

Q. The preliminary hearing of this case?

A. I'll give you the date it was to be sure I'm not telling you the wrong story. I think this date is right. August the 6th I think is the right date. The thing of it is I've gone—I've left my home on this case sixteen different times, your Honor, and only six times have I been able to actually appear in a courtroom, and of those six times only twice has the defendant showed up. This is what I'm up against.

MR. HARRIS: Well, Object and move to strike all of that. It's completely irrelevant, irresponsive. There was no question asked.

COURT: Any more questions?

MR. HARRIS: Yes sir.

Q. If the first time you identified this man was at the hearing, can you explain why he was arrested?

A. Can I explain why he was arrested?

### OBJECTION SUSTAINED

Q. All right. Did you not in fact, Mr. Reeves, identify this man at some time prior to that hearing?

A. Can I make a comment before I answer the question or—

MR. LILES: Answer it and then explain, Mr. Reeves.

A. Yes, I think I did. Now, if I can make any comment—

COURT: All right. Go ahead.

A. Okay. Relative to information that was given to me by persons who had in their possession articles that I had listed as missing or as stolen, I was given the names of some suspects that could have been the ones who strong-armed me, and upon this suspicion an affidavit—I don't know if it was a John Doe affidavit or not or whether it was listed by names—but warrants were issued for the arrest of persons that included Mr. Gaiten, and it was after having seen him from that suspicion that I identified him as being the one person that I remembered most vividly as being the guy who strong-armed me and did the things which I have said.

Q. I'm sorry, but I just don't understand exactly what happened there and I'm trying to. Believe me. You say that relative to certain information given to you about articles missing, John Doe warrants or some kind of warrants were issued for the arrest of certain people, among whom Mr. Gaiten was included?

A. That's correct. When the charge of fraudulent use of a credit card was issued against John Wilson Patton in Hickory, my creditors from one of the credit card companies called me from Winston-Salem and told me of this thing because I had reported it. And when I went to Hickory, the names of the persons were given to me and a photograph I know of John Wilson Patton. But I don't recall—I don't remember if photographs of the other individuals were

also shown to me at that time. But it was upon this suspicion that affidavits were issued for the arrest of these persons. At the hearing—

Q. Stop right now. Now, you're saying that—or are you saying that police officers supplied you with the names of the persons that were supposed to have robbed you?

A. No, I didn't say that.

Q. Then you said that the names of persons were given to you?

A. No, I didn't say police officers gave me that information. No. I said that I was called from Winston-Salem by the man who would naturally be responsible for a missing credit card with Wachovia, the Wachovia Bank chain, and this is where I got this information.

Q. And this man with Wachovia gave you the names of the persons that robbed you?

A. He gave me the information that led to the getting of the people who had—

Q. Well, what information did he give you?

A. He gave me where they were arrested, the articles that they had in their possession, and there was at least one picture of a person.

Q. And upon that information is what you based your trip to Hickory on, is that right? ·

A. Yes, that and a news article.

Q. And when you got to Hickory, was Mr. Gaiten one of the persons arrested for having this—

A. He was one that—yes, he was arrested but not charged.

Q. *Did you see him in Hickory?*

A. *No, not in person.*

Q. So one person was charged, is that correct, out of these people that were arrested, John Wilson Patton?

A. That's my understanding.

Q. Now, the other persons that were arrested but not charged, are these persons that warrants were issued for in Charlotte?

A. I'm not sure of that. I'm only concerned with this man here.

Q. I am, too, but I would like to know how he was identified by you.

COURT: *Now, he has told you, Mr. Harris. He rambled around in Hickory* and over to Winston-Salem by reason of a credit card being used or about to be used, *and he got certain information, which is entirely irrelevant to the issue in this case,* and then he told you further that he didn't identify this man anywhere until—except that he saw a mug in Hickory, as the court recalls it, that he thought resembled this man here; that somebody handed him a mug, a picture, of him, and that he didn't identify this man anywhere until he made an in-court identification. That is the substance of what this man has told you.

## EXCEPTION NO. 14

MR. HARRIS: Thank you, your Honor.

COURT: That's the substance of it. Now, there was a lot of rambling around in it but that's—

MR. HARRIS: I'm sorry. I understood him to say that he saw one photograph of this person that was charged, John Wilson Patton.

COURT: Yes. That's somebody else. He's not even in here. *It's irrelevant here.*

## EXCEPTION NO. 15

Q. (By Mr. Harris) That's right. But did you in addition see other photographs, or do you remember?

A. This is what I was telling you but you wouldn't give an ear to. You kept saying you didn't understand me. *I told you that my purpose up there was to identify that man and not this man here.*

COURT: Now, if the court is incorrect about my understanding of the evidence—he didn't identify this man anywhere until there was an in-court identification at a hearing on August the 6th. That was an in-court identification. Is

that correct, Mr. Harris? Do you understand any different from that?

## EXCEPTION NO. 16

MR. HARRIS: Your Honor, I understand what you're saying but I don't understand how someone can be charged unless he is identified prior to the arrest.

COURT: He said that this man was charged but not arrested. He didn't arrest him. He doesn't know anything about it. He just understands he was charged but not arrested, that this defendant here was; that a hearing came on sometime or other by some reason or other and this boy appeared in court and he was there and identified him. Is that what you're saying?

## EXCEPTION NO. 17

A. That's correct.

COURT: *So all of that's irrelevant to the issue here.*

## EXCEPTION NO. 18

COURT: All right. Let the jury come back. I'm going to let the jury go now. You gentlemen stay here just a minute.

(WHEREUPON the jury returned to the courtroom.)

\*    \*    \*    \*    \*    \*

(WHEREUPON [without further testimony] recess was taken until November 19, 1969, at 9:30 a. m., the following proceedings taking place.)

RECROSS EXAMINATION of Mr Reeves continued by Mr. Harris: [No formal effort was made to re-tender the excluded evidence.]

From this transcript of the crucial evidence it is apparent (1) that counsel for the defendant was seeking to cast doubt on the identification and the witness's reliability by bringing out evidence before the jury that the first identification was not made at the time nor under the circumstances set out on the direct examination; (2) that the excluded evidence did in fact contradict the witness

and raised serious doubt as to the accuracy of the identification; (3) that the trial judge erroneously considered all this evidence to be irrelevant; (4) that counsel for the defendant made no voluntary waiver but obviously wanted the jury to hear the evidence; and (5) that the court was obviously, and with considerably more authority, determined that the jury should not hear this evidence.

Cross-examination on a vital point was obviously curtailed by the rulings of the court.

Of considerable significance to attorneys familiar with North Carolina trial practice is the order which the court gave defense counsel as soon as the jury left the courtroom and which he repeated thereafter:

"All right. Put it in the record."

■ In the vernacular of North Carolina practice such an order traditionally means that the evidence about to be taken is going to be disregarded by the trial court; that it is for the appellate courts to read and not for the jury to consider; and that a re-tender of such testimony may provoke the displeasure of the trial judge if not an outright rebuke. See, e. g., Hallinan v. United States, 182 F.2d 880 (9th Cir., 1950), cert. denied 341 U.S. 952, 71 S.Ct. 1010, 95 L.Ed. 1375, rehearing denied 342 U.S. 956, 72 S.Ct. 623, 96 L.Ed. 710, rehearing denied 343 U.S. 931, 72 S.Ct. 756, 96 L.Ed. 1341 (1952).

It would appear that counsel did as much as a diligent and discreet lawyer should be expected to do in order to preserve the rights of his client and to make clear to trial court and reviewing court the error which he thinks the trial judge is committing.

## CONCLUSIONS OF LAW

Petitioner contends that the refusal of the trial judge to require answers to the questions quoted above, and the absence of the jury during a portion of the cross-examination, constitute denial of his Sixth Amendment rights.

In Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), the Supreme Court held that the Sixth Amendment right of an accused to confront the witnesses against him was a fundamental right and was made obligatory on the states by the due process clause of the Fourteenth Amendment. Subsequent cases have held that the same strict standards which protect the right of confrontation against federal encroachment pertain to the states. See, e. g., Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); Brookhart v. Janis, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966).

An integral part of the right to confront witnesses against a defendant is the right of a defense attorney to cross-examine. Where the scope of cross-examination is unreasonably restricted, an accused's right to confront may be violated.

In Smith v. Illinois, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968), a case factually similar to the situation presented here, the defense attorney was prevented from asking the prosecuting witness his correct name and where he lived. The Supreme Court reversed Smith's conviction reasoning that, since the credibility of a witness is often an important aspect of cross-examination, "[t]o forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself." Smith, supra, at 131, 88 S. Ct. at 750. See also, Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L. Ed. 624 (1931).

Indeed, the evidence not available to the jury in the Gaiten trial was far more probative than that involved in Smith. In the Smith case, the defense attorney later admitted that he knew before trial the name of the prosecuting witness (see Justice Harlan's dissent, supra, 390 U.S. at 135, 88 S.Ct. 748). In the Gaiten trial, the evidence which developed while the jury was out of the courtroom flatly contradicted witness Reeves' earlier testimony that he identi-

fied Gaiten in Hickory. This confusion was certainly material as to the credibility of Reeves' testimony, especially in light of Gaiten's testimony that he was walking away from Reeves' car with his girl friend when the robbery began and that he (Gaiten) kept walking in order that he would not get involved (R. pp. 35–36).

Respondents contend, however, that even if petitioner's Sixth Amendment rights have been abridged, petitioner's constitutional rights were waived when Gaiten's attorney failed to attempt to cross-examine Reeves, after the jury returned to the courtroom, concerning his identification of Gaiten. The North Carolina Supreme Court's opinion affirming petitioner's conviction rested primarily on waiver, State v. Gaiten, 277 N.C. 236, at 239–240, 176 S.E.2d 778 (1970).

Recent opinions of the United States Supreme Court demonstrate that the question of waiver of a federal constitutional right is a federal question controlled by federal law. See generally, Annotation, "Federal Constitutional Right to Confront Witnesses," 23 L. Ed.2d 853, at 877–879. The classic definition of waiver was enunciated in Johnson v. Zerbst, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023, 82 L.Ed. 1461 (1938) by Mr. Justice Black: "A waiver is ordinarily an *intentional* relinquishment or abandonment of a known right or privilege." This federal standard has been interpreted to mean that "courts must indulge every reasonable presumption against the loss of constitutional rights," Illinois v. Allen, 397 U.S. 337, 343, 90 S.Ct. 1057, 1060, 25 L.Ed.2d 353 (1970). See also, Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Gray v. Wilson, 230 F.Supp. 860 (N.D. Calif.1964). The *Zerbst* test "stresses the consensual 'free choice' character of waiver" and requires the one who waives a constitutional right to make his decision in an "uncoerced exercise of his rational faculties." "Foreward: Waiver of Constitutional Rights: Disquiet in the Citadel," 84 Harv.L.Rev. 1, 8 (1970).

The Supreme Court's intention to allow waiver of constitutional rights only on a clear showing of voluntary, uncoerced, rational decision can also be seen in recent cases dealing with the Sixth Amendment right of confrontation. In Douglas v. Alabama, *supra*, the prosecution read to the jury a confession allegedly made by the defendant's accomplice. Defendant's counsel thrice objected to the reading of the confession as a violation of defendant's right of confrontation. The state court held that counsel had failed to object at the proper time. The Supreme Court, however, although it accepted as authoritative the Alabama court's interpretation of Alabama law, reasserted its rule that "the adequacy of state procedural bars to the assertion of federal questions is itself a federal question," and reversed the conviction. Douglas v. Alabama, *supra*, 380 U.S. at 422, 85 S.Ct. at 1078. See also, Wright v. Georgia, 373 U.S. 284, 289–291, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963).

In Brookhart v. Janis, *supra*, the defendant's counsel agreed that the prosecution need only present a *prima facie* showing of guilt and stated he would not offer evidence on the defendant's behalf or cross-examine prosecution witnesses. The *defendant*, however, emphatically stated "in no way am I pleading guilty." *Brookhart*, supra, 384 U.S. at 6, 86 S.Ct. at 1248. The Supreme Court, again emphasizing that waiver of a federal right is a federal question, reversed the defendant's conviction, holding that "rights of a defendant cannot be waived by his counsel under such circumstances." *Brookhart*, supra, at 7, 86 S.Ct. at 1248. The Supreme Court's clear intent to insure that waivers of fundamental rights are voluntarily and knowingly made is again evident in the recent decisions requiring extensive examination of guilty pleas. See, McCarthy v. United States, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969); Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

 Counsel had sought to cross-examine in the presence of the jury. The court erroneously treated all the proposed testimony as irrelevant. The court had given full notice that a tender of the testimony in open court would be rejected. His order to "put it in the record" was a clear signal that any effort to put it before the jury would be overruled. The decision of counsel under these circumstances not to re-tender the offending evidence in the presence of the jury is not in compliance with customary North Carolina courtroom procedure, but it should not be held a waiver of the defendant's constitutional right to confront adversary witnesses.

It is, therefore, ordered:

1. That the petition for a writ of habeas corpus is hereby granted;

2. That petitioner be given immediate consideration for bail by the appropriate state authorities; and

3. That petitioner be given a new trial within a reasonable time or be given his freedom outright, and that the Attorney General of North Carolina advise the court within sixty (60) days which course will be followed.