Linroy DAVIS, Petitioner,

v.

Louis B. HEYD, Respondent.

Civ. A. No. 71–1797.

United States District Court,
E. D. Louisiana,
New Orleans Division.

Jan. 19, 1972.

Robert Glass, New Orleans, La., for petitioner.

Jack P. F. Gremillion, Atty. Gen., James Garrison, Dist. Atty., Maurice Franks, Asst. Dist. Atty., for respondent.

ALVIN B. RUBIN, District Judge:

The applicant seeks a writ of habeas corpus on the basis that state court determinations of the issues here raised have not resolved the federal constitutional questions presented by the application. This makes it necessary to consider whether the state court's findings were of a factual nature, and whether the 1966 Amendments to the Habeas Corpus Act, 28 U.S.C.A. § 2254, apply.

The applicant was convicted of manslaughter in Louisiana state court on September 20, 1968. A motion for a new trial was made by his court-appointed counsel, but was denied by the trial court. Evidentiary material was attached to the state's response to the application for a new trial. Counsel for the defendant filed a motion for appeal, but failed to perfect the appeal, submit a brief, or appear for argument. Almost two years later, represented by new counsel, the applicant sought a writ of habeas corpus in state court, alleging denial of an effective appeal, and requested relief by way of an out-of-time appeal. The state court granted an out-of-time appeal. The evidentiary material attached to the state's response to the application for a new trial was presented to the Louisiana Supreme Court on the appeal. The issues raised in the state courts, which are the same as those now urged as bases for a federal writ of habeas corpus, were that Mr. Davis had been convicted in violation of the due process and confrontation clauses of the United States Constitution because the state had withheld the pretrial statements of witnesses and photographs that both supported his defense and contradicted the testimony of major State witnesses, and further because, by sustaining objections to two questions put by defense counsel to one of the

state's witnesses, the State trial judge had denied Mr. Davis the right of cross-examination.

On June 7, 1971, the Louisiana Supreme Court decided both issues adversely to the appellant and affirmed his conviction. State v. Davis, 1971, 259 La. 35, 249 So.2d 193.

## I. FACTUAL BACKGROUND

In order to understand the issues, it is necessary to review the events before and during the trial in state court.

New Orleans police arrested the applicant, Linroy Davis, for the murder of James Dyer on July 26, 1966. The Grand Jury return was "Not a true bill." Then the Orleans Parish District Attorney filed an information charging manslaughter. Almost two years later, and just three days before the prosecution would have prescribed, LSA–C.Cr.P. art. 578, the case was set for trial. After being continued, the trial commenced one day before the lapse of the time within which prosecution is permitted. The jury [1] returned a verdict of guilty by a 10–2 vote. The events recounted at the trial were these:

On Sunday, July 24, 1966, Linroy Davis, who was in an automobile with another man, spoke from the car to Miss Brenda Mae Dyer, a sister of the deceased, in front of the deceased's home. Mr. Davis and Miss Dyer were not acquainted. When James Dyer, the deceased, went to Davis' car to protest Mr. Davis' remarks to his sister, Mr. Davis got out of the auto and slapped Mr. Dyer on the side of his head with a pistol. Miss Dyer picked up a brick to throw at Mr. Davis, but Mr. Davis returned to his automobile and drove off, pointing the pistol at her. Mr. Davis circled the block and, seeing the decedent's twin brother, pointed the gun at him and drove off.

Later that afternoon the Dyers' father, the Reverend John Dyer, a minister, returned from church. His family told him of the events that had just occurred, and he drove in an automobile with his sons, James, Joseph, and John, looking for Mr. Davis. He saw a car that he recognized as Davis' from the description, and, as he drove up, he saw Mr. Davis standing in the doorway of the house in front of which the car was parked. The Reverend Dyer left his sons in the car and walked up to Mr. Davis.

## II. CONFLICT IN TESTIMONY

Much of the testimony at the Davis trial consisted of varying accounts of what happened thereafter. The Reverend Dyer testified his objective was to "reform the boy;" after the conversation began, Mr. Davis pulled out a gun; he tussled with Mr. Davis; his sons came to his aid; the gun went off; and James Dyer was shot. Joseph Dyer's testimony was substantially in accordance with his father's. John Dyer was absent in the armed forces, stationed in Germany, and did not testify.

The defense called the defendant's mother who testified that she came into the room before the shot was fired, and that, in effect, the Dyers were the aggressors in the fray then going on. Mr. Davis testified that the Reverend Dyer grabbed him and, in the struggle they fell to the floor. The older man began to choke him. Then the other Dyers joined in the fray. He managed to grab the gun, the Dyers tried to take it away, and it went off. Other witnesses confirmed parts of these accounts.

The Dyers were subjected to vigorous cross-examination by appointed counsel who was then defending Mr. Davis. When the state answered the defense motion for a new trial in 1968, defense counsel learned for the first time that the District Attorney had taken written statements from the Dyers before the trial and also had three photographs of the accused taken shortly after the fray. The failure to produce these at the trial

[1]. The parties have refused to stipulate the racial or sexual composition of the jury, and no evidence concerning it was introduced.

is the basis of the first claim by the applicant.

These statements and photographs were before the state Supreme Court when it heard Mr. Davis' out-of-time appeal. Counsel for the applicant was offered an opportunity to file additional evidence in this court. However, no evidence has been offered that was not adduced at the time of the second state appeal, except an affidavit by applicant's former counsel that he didn't know of the existence of the written statements and photographs until after the trial; "the statements would have been extremely helpful if not crucial for the defense of Davis at the trial;" they were "essential to a fair trial;" and he believed that with them he could have obtained a verdict of acquittal.

## III. FAILURE TO DISCLOSE THE STATEMENTS AND PHOTO-GRAPHS

■ It can no longer be questioned that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution," Brady v. State of Maryland, 1963, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–1197, 10 L.Ed.2d 215, and also, of course, irrespective of whether the state has adopted procedural rules calling for discovery in criminal cases. The mere failure to afford discovery is not a denial of due process; suppression of material evidence favorable to the accused is. And the failure of the accused to ask for favorable evidence in the prosecution's possession cannot be deemed a waiver of the constitutional right to due process where the defense counsel does not know of the existence of such evidence. A waiver of a constitutional right must be knowing and informed. Brady v. United States, 1970, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747; Brookhart v. Janis, 1966, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed. 2d 314.

■ The Constitution does not oblige the prosecution to divulge its files to the defendant. But it does require that the state disclose medical opinions favorable to the defendant on issues vital in the case, Ashley v. State of Texas, 5 Cir. 1963, 319 F.2d 80. It does require the prosecution to correct false testimony even though it is unsolicited. Napue v. People of the State of Illinois, 1959, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L. Ed.2d 1217.

Whether it requires the state to divulge "all evidence admissible and useful to the defense, and the degree of prejudice which must be shown to make necessary a new trial" are questions that have not been fully resolved. Giles v. State of Maryland, 1967, 386 U.S. 66, 74, 87 S.Ct. 793, 797, 17 L.Ed.2d 737. In Giles the Supreme Court found it "unnecessary, and therefore inappropriate, to examine those questions." Ibid. There the Court had before it evidence that had not been considered below, and it remanded the case for a determination of whether false testimony had been permitted to stand.

The opinion in Giles was a plurality opinion, adopted by four Justices. Justice Fortas concurred, but the majority refrained from endorsing his view that would require the state to disclose all information "which is material, generously conceived, to the case, including all possible defenses." 386 U.S. at 98, 87 S.Ct. at 809. Even Justice Fortas, however, did not conceive it the state's duty "to communicate preliminary, challenged, or speculative information." Ibid. The jurisprudence prior to Giles is fairly summed up in Justice Harlan's dissent:

The Court has held since Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, that a State's knowing use of perjured testimony denies a fair trial to the accused. Mooney has been understood to include cases in which a State knowingly permits false testimony to remain uncorrected. Alcorta v. State of Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9; Napue v. People of State of Illinois, 360 U.S.

264, 79 S.Ct. 1173, 3 L.Ed.2d 1217. The standard applied in such cases has been whether the testimony "may have had an effect on the outcome of the trial." Napue v. People of State of Illinois, supra, 360 U.S. at 272, 79 S.Ct. at 1179. These cases were very recently followed and applied in Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690. Apart from dicta in Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, the Court has never gone further. Nor, in my view, does the Constitution demand more. This standard is well calculated to prevent the kinds of prosecutorial misconduct which vitiate the very basis of our adversary system, and yet to provide a firm line which halts short of broad, constitutionally

required, discovery rules. It both guarantees the fundamental fairness of state criminal trials, thereby satisfying in full the requirements of the Fourteenth Amendment, and preserves intact the States' ultimate authority for the conduct of their systems of criminal justice. 386 U.S. at 116–117, 87 S.Ct. at 818–819.

The failure to produce the photographs is no longer seriously urged as a basis for a new trial. They would tend to show that Linroy Davis was badly bruised about his face. But the testimony at the trial on both sides supported no other conclusion.

Excerpts from the statements that are alleged to be significant are set forth at length in the footnotes beside the testimony with respect to the same events.[2]

2. *Statement of John Dyer:*
 "We stopped and my daddy called him and Lenroy (sic) came and stood in the door. They were talking but I couldn't hear what. It didn't seem like they were arguing because they were talking low. While they were talking the door was opened and my daddy had him (sic) arm on the door. I then saw Lenroy (sic) back up and go in his pocket. My little brothers then ran up on the porch and I was still partly in the car. They were all tussling and they all fell back into the house on the sofa. By this time I got up there and I saw Lenroy (sic) come up with the gun and he had his hand on the trigger. He was holding the gun with the barrell (sic) pointed up toward the ceiling. Lenroy (sic) started to bring the gun down and James grabbed him by the arm that he had the gun in. I then heard the gun go off and I grabbed him by the arm and put his arm back and took the gun away from him. James turned aloose and I heard James say he was shot."
 *Statement of Reverend John Dyer:*
 "I asked him if he was the one that hit James with the gun and he said yes (sic). Then I told him 'don't you know that there is a law against carrying a gun?' At this time he became loud and came out of his pocket with a gun. Prior to this he had kept his right hand in his right front pocket. When he came out with the gun I grabbed his right wrist and the struggle began. We then fell back into the house on the

sofa in the front room. It was at this time that my sons came to my aid. While we were all struggling on the sofa his mother came from the back into the room. He told his mother, 'Get back.' At this time the gun went off. We still kept struggling and went in to the next room not knowing my son was shot."
 *Testimony of Reverend John Dyer:*
 "Q. Did you have an occasion to converse with Linroy Davis then?
 A. There was about two or three words that I spoke to him.
 Q. What did you say, sir?
 A. I asked him if he was the one that struck my son with the gun, he replied yes. I said, boy, you know you could go to jail for carrying a gun and striking? He said, no, I won't, and at that precise time he pulled his hand out of his right front pocket, his right hand, with a gun in his right hand, aimed the gun at me and I was in hand's reach of him. I grabbed him at that precise time and after I grabbed him he and I began to tussle and we fell back up in his mother's living room.
 Q. What happened when you got into the living room, Reverend?
 A. Then he tried to throw me down and I slung him around up on the sofa bed and at this time, only at this time, did my sons come to my aid.
 Q. Did all three of your sons come?
 A. All three of my sons.

The Louisiana Supreme Court found:

The statements are essentially the same as the trial testimony of Reverend Dyer and his son Joseph; that, after Reverend Dyer remonstrated with him ("you could go to jail for carrying a gun and striking"), then the defendant Davis pulled a gun—following which, Reverend Dyer, joined then by his three boys, scuffled to disarm him of the gun.

The pre-trial statements of Reverend Dyer and John are almost identical to this trial version. . . . The

* * * * *

Q. What happened then, Reverend?
A. After the tussle was still going on, his mother came from the back room and said you all turn my boy loose, leave my boy alone. At one time she said Linroy give me the gun, and at this time he told his mother get back out of the way.
Q. Linroy told his mother this?
A. He told his mother that. Then I heard the gun when it went off, not knowing that my son was shot."

*Statement of Joseph Dyer:*
"My father walked up on the porch and Lynroy (sic) was standing in the door with the screen open and his hand in his pocket. *I turned my head and when I looked back my father and Lynroy (sic) were tussling.* My father then fell with Lynroy (sic) up in the door on the sofa in the front room. Me and my brothers then ran up into the house. *At this time I saw Lynroy (sic) coming out of his pocket with a gun and coming down with it.* When he went to aim it, my brother James grabbed his arm and at this time Lynroy (sic) pulled the trigger. When I saw my brother hit to the floor, I figured he was shot." (Emphasis supplied).

*Testimony of Joseph Dyer:*
"Q. What happened after you got to Linroy's house?
A. After we got to the defendant's house, my father, he told us to wait in the car, we were going some place that evening. So we stayed in the car and he went on the porch and Linroy was in the door with his hands in his pocket with the screen door propped halfway open. So him and my father was talking so I happened to turn

pre-trial statement of Joseph says, however, that, after his father went to the door to talk to Davis, he (Joseph) saw his father and Davis tussling, and that he and his brothers ran into the house and, *"At this time I saw Linroy coming out of his pocket with a gun. . . . "* State v. Davis, 1971, 259 La. 35, 249 So.2d 193, 195.

The Louisiana Supreme Court then focused on the precise issue here sought to be made:

The argument is thus made that Joseph's pre-trial statement that the de-

my head and look around then I seen Linroy pull the pistol out of his pocket on my father. Then they started struggling, and so after we saw that, we all broke out the car and ran in the defendant's house and my father was holding Linroy trying to disarm the pistol. After that his mother came to the front, that's when he told his mother to get back and that's when he pointed the gun, he aimed the gun and shot my brother.
Q. You say he aimed the gun. I want you to describe exactly what happened immediately before your brother was shot.
A. You were talking about when I first walked in the door?
Q. After you got in the house and while you were struggling with Linroy Davis, I want you to describe exactly what happened immediately before your brother got shot.
A. Immediately just before my brother got shot, we were holding him down on the bed. Before we walked in there my father had one of his hands and he was holding him down with the other hand trying to disarm him, you know, with the pistol.
Q. Where was that?
A. On the sofa bed in the living room.
Q. Is that the first room as you go into the house?
A. Yes, that's the first room.
Q. And then what happened?
A. After we grabbed hold to him he hollered to his mother to get back out of the way. That's when he fired the shot, aimed the gun and fired the shot."

fendant Davis did not draw his gun until *after* Reverend Dyer and Davis began fighting is more consistent with the defendant's trial testimony than with the Dyers' trial version. From this inconsistency, counsel skillfully argues that the accused was deprived of a cross-examination weapon which might have caused the jury to disbelieve Joseph's further trial testimony that he actually saw the defendant aiming the gun at James before James was shot. (Joseph's pre-trial version is identical as to this fact.) "We do not so hold," the court continued.

The seeming inconsistency between Joseph's pre-trial statement and his trial testimony might possibly be explained as a matter of imperfect articulation trying to describe the moment when Joseph observed the gun being aimed at his brother.

Assuming not, nevertheless, in essential outline the pre-trial testimony does not differ from the trial testimony of Joseph and the other witnesses: that the Dyers were unarmed, that the accused pulled his gun out of his pocket while arguing with Reverend Dyer, and that the Dyers' only object was to disarm him and turn him over to the police.

For a similar reason, we also reject the argument that the failure earlier to disclose the absent John Dyer's pre-trial statement was prejudicial, as such statement might have afforded grounds for continuance. We do not construe the statement, as does the defendant, as tending to support the defendant's theory of accidental discharge; as we read it, John stated that the defendant Davis was bringing the gun down to shoot one of the Dyers when James grabbed his arm. The gun was then fired.

Louisiana law does not require pre-trial discovery of statements taken from potential witnesses. Failure to disclose the present statements did not amount to a denial of due process through suppression of evidence favorable to the accused: For there is no substantial inconsistency between the pre-trial statements and the evidence introduced at the trial. 249 So. 2d at 195.

It is thus clear that the Louisiana Supreme Court examined the very evidence this court is asked to examine, and drew both factual and legal conclusions therefrom. To what extent should this court undertake to review these conclusions?

## IV. THE STATUTE

28 U.S.C. § 2254 was amended after the decision in Townsend v. Sain, 1963, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 "so as substantially to codify most of the habeas corpus criteria set out in Townsend v. Sain," Procunier v. Atchley, 1971, 400 U.S. 446, 451, 91 S.Ct. 485, 488, n. 6, 27 L.Ed.2d 524. Because that statute confers the jurisdiction by which federal courts may issue writs of habeas corpus for prisoners in state custody, its terms are not merely precatory. As amended, the statute provides, in relevant part:

> . . . [A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

> \* \* \* \* \* \*

It continues:

> In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct un-

less the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

\* \* \* \* \* \*

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

■ The statute is not restricted in its terms, or by any reasonable inference, to findings made by a state trial court. Its reference to "a State court" implies a determination by the state court that actually was empowered to make the determination. While *Townsend* does refer to a determination by the state court "trier of fact," this signifies only that the facts were found by the state court with authority to do so. In this case the facts were presented to a state appellate court, and reviewed by it. That satisfies the statute and the state court's findings must be presumed correct. Neither the evidence offered nor the legal conclusions urged overcome that presumption.

Indeed, while the state trial court made no express determination with respect to the consistency or inconsistency of the trial testimony with the pre-trial statements, it did find that "counsel does not show how defendant was prejudiced." Tr. 83. It is implicit in its determination that it found no inconsistency serious enough to warrant a new trial. That amounts to a resolution of the merits of the factual dispute just as the Louisiana Supreme Court's later determination again resolves it more explicitly.

Of course, there was more before the state courts than a simple question of a fact that could be resolved in binary fashion, "Yes" or "No", "True" or "False." The state had pre-trial statements in its possession. The statements had not been made available to the defense. They were in words different from those used at trial.

■ But the mere existence of an undisclosed pre-trial statement by a prosecution witness would not warrant issuance of the Great Writ. Only when that statement is so *inconsistent* with the trial testimony as to warrant the conclusion that its non-production amounted to a denial of due process does the writ lie.

What is "consistent" or "inconsistent" in this sense is a complex question, but it is basically one that involves "the merits of the factual dispute." 28 U.S. C. § 2254(d)(1). There is no inconsistency merely because the witness did not twice parrot the same words, nor does inconsistency sufficient to constitute a violation of the prosecution's duty arise

merely because a witness' statements differ in some microscopic detail from his trial testimony. What is inconsistency is a question of fact, albeit not resolvable by a computer-style answer.

If inconsistency be found, whether the failure to disclose the inconsistent statement is a denial of a constitutional right is a legal determination. Here the determination by the state court was twofold: first, the statement was not inconsistent with the trial testimony; second, if it was, the difference was not sufficient to make non-production prejudicial.

■■ Where constitutional error is committed in a trial, that error must be shown to be harmless beyond reasonable doubt or the writ should issue. Harrington v. California, 1969, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284; Chapman v. California, 1967, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705. But that rule does not apply here. For it rests on a premise not here established: that a constitutional right was denied. And, though it may belabor the obvious, the principle of *Brady* is that there is no denial of a constitutional right unless it be shown that the state's failure to produce amounted to suppression of material evidence or to knowingly permitting false testimony to remain uncorrected. See the discussion of the 1966 Amendments in Comments, The Federal Habeas Corpus Act and the Recent Amendments to the Act Limiting Its Use and Abuse by State Prisoners, 22 U.Miami L.Rev. 409, 419 (1967); Statute Note, 45 Texas L. Rev. 592 (1966).

■ While the federal court must reach its own constitutional conclusions in every case, it does not follow that it must make *de novo* all of the factual decisions that affect its conclusion. In *Townsend*, the Court said:

> In any event, even if it is clear that the state trier of fact utilized the proper standard, a hearing is *sometimes required* if his decision presents a situation in which the "so-called facts and their constitutional signifi-

cance [are] so blended that they cannot be severed in consideration." 372 U.S. at 315, 83 S.Ct. at 758.

■ But this does not mean that, even in such cases, a *hearing is always* required or that the federal trier of fact should ignore what the state has done. The problems involved when the case is presented to a federal court after a state court determination have been discussed perceptively by Judge J. Skelly Wright and Abraham D. Sofaer in Federal Habeas Corpus for State Prisoners: The Allocation of Fact Finding Responsibility, 75 Yale L.J. 895 (1966). As the authors point out,

> But if the federal courts find the facts anew in all cases, there would be little purpose in having an original adjudication of federal rights in the state courts. So long as the state courts are left with the role of fact-finding, habeas corpus will remain a review, rather than an original proceeding. Moreover, the practice of accepting state resolutions of factual disputes made after full and fair hearings appears on a pragmatic basis to be a proper allocation of fact-finding responsibility, since difficulties inherent in fact-finding are compounded in habeas corpus by the passage of time and its effect upon memories and physical evidence, the increased difficulty of proving perjury, and the problem of bringing available witnesses, evidence and records to the district within which the prisoner is confined. 75 Yale L.J. at 920–921.

■ Both Brown v. Allen, 1953, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469, and *Townsend*, recognize the importance of allocating primary fact-finding responsibility to the state courts. If this authority reposes in state courts, then the federal court's "inquiry should not be whether the state court findings are correct in some absolute sense. The district courts should, and *Townsend* requires generally that they must, direct their attention principally to the ques-

tion whether the conditions under which a challenged finding was made were sufficiently reliable to warrant acceptance of the finding regardless of its correctness in the absolute sense." Wright & Sofaer, *supra,* 75 Yale L.J. at 922.

Here the state court record is complete. There is no complaint about the fairness of the hearing before the state court on the claims now advanced. The state court's determinations are fairly supported by the record. No defects in the fact-finding process are alleged. No newly discovered evidence is pointed to except the original trial lawyer's conclusionary affidavit.

██ It is the state court's conclusions themselves that are challenged, on the basis that they are wrong—either because they do not explicitly resolve factual issues or because they are conclusions of law. But, insofar as factual issues are presented, the state court's findings are explicit. And insofar as they are legal in nature, they do not depart from established constitutional criteria. If this court undertook to renew the determinations, it would disregard the purpose of the 1966 amendments, as stated in the supporting Judicial Conference Resolution and in the Senate Committee report:

> It is the opinion of your committee that the proposed legislation, if enacted, will be a strong inducement to the States that have not already done so to provide adequate postconviction remedies and procedures and to make and keep available records of evidentiary matter in criminal and postconviction proceedings, and to the State courts in criminal proceedings to safeguard the constitutional rights of defendants. Senate Report No. 1797, 1966 U.S.Code Cong. & Admin.News, vol. 3, p. 3665.

Counsel for the prisoner cannot be faulted for his ardent desire, capably presented, to gain a new trial for his client, nor for his willingness to press positions on the court without regard to their impact on federal-state relationships. But federal courts constitutionally should not, and physically cannot, review every fact-finding in a state criminal trial that raises some potential federal issue merely because it might find the facts differently.

The whole process of fact-finding is difficult and uncertain, and there is no assurance that he who hears them last will necessarily decide them right.

Few areas of law illustrate as strikingly as habeas corpus, however, that the future of our federal system of criminal adjudication is ultimately in the hands of the states. While expanding constitutional protections make virtually all criminal proceedings subject to federal review, the degree of federal protection has been and will continue to be affected by the failure of state courts to provide adequate machinery properly to adjudicate and review federal claims. At present, district courts must defer to state findings of fact made after full and fair hearings, thereby leaving with state courts the power to control the ultimate disposition of federal claims in most cases. But this allocation of fact-finding responsibility is not inviolate. The Supreme Court has made clear that federal courts have power to review both law and fact. It is up to the states whether this power will eventually be exercised to the full. Wright and Sofaer, *supra,* 75 Yale L. J. at 984–985.

██ For these reasons, the state court's findings should be accepted. But if it is my duty to review the record anew, then I must conclude that there was not error of constitutional dimensions in the prosecutor's failure to produce the evidence in question for scrutiny by counsel for the accused. The State did not use perjured testimony, it did not suppress truth, it did not knowingly foist error on the jury. At the worst, it failed to divulge to defense counsel material that might have assisted in cross-examination.

The Great Writ does not function in an empyrean world. It exists to correct error in a system that orbits on the Constitution, with its guarantee of the right to trial by jury, and its implicit embodiment of an adversary trial. The accused is protected by the presumption of innocence, by the requirement of proof beyond reasonable doubt, and by the privilege against self-incrimination. The prosecution is not free to seek conviction at all cost; it has duties to the accused imposed at least in part because it represents the State and the State's paramount duty is to seek justice under law.

 But the prosecution's duty does not extend making available to the accused its entire work-product so that the defendant's counsel can select eclectically those bits that favor his side. Hence habeas corpus will not issue merely because there was in the State's files something that might have been utilized in the trial or that might be effective in obtaining a different result in a second trial. It has not been shown here that the State's failure to alert the defense to the documents in its possession or to produce them at the state trial denied the applicant of any constitutional right.

## V. CROSS EXAMINATION

The state trial court sustained objections to two questions put to the Reverend Dyer:

(1) "Mr. Dyer, have you ever been identified as an active participant in several militant civil rights groups . . ." (Tr. 139)

(2) "Mr. Dyer, have you ever been involved in an act of physical violence with one Nancy Dyer?" (Tr. 140)

These rulings, it is contended, denied the accused the right to cross-examine the witnesses against him, despite the fact that the witness was in fact searchingly cross-examined on other matters. It is error for the trial court to refuse cross-examination ad-

dressed to a relevant area of inquiry. United States v. Greenberg, 5 Cir. 1970, 423 F.2d 1106; Grant v. United States, 5 Cir. 1966, 368 F.2d 658; Beaudine v. United States, 5 Cir. 1966, 368 F.2d 417, 421. Where the scope of cross-examination is unreasonably restricted, this violates the constitutional rights of the accused. Smith v. Illinois, 1968, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956; Gaiten v. Stahl, W.D.N.C.1971, 327 F.Supp. 415.

 Arguably, the ruling on the first question was correct. The racial composition of the jury is not known, but, to a New Orleans jury in 1968, testimony that a witness was "an active participant in several militant civil rights movements" was potentially inflammatory, and not necessarily relevant to any issue in the case. For only by a dubious reasoning process could the jury conclude that activity in militant civil rights groups indicates a personal propensity for physical violence.

 The second question cannot be said to be completely irrelevent or utterly without probative value. But this does not mean it was admissible. In general a witness may not be impeached by showing that he engaged in particular acts of misconduct. 3A Wigmore On Evidence, §§ 978, 979; McCormick, Law of Evidence, § 42.

 However, the performance of similar acts on prior occasions may be introduced to show intent. 2 Wigmore § 301. But as Wigmore points out:

Yet, in order to satisfy this demand, it is at least necessary that prior acts should be *similar*. Since it is the improbability of a like result being repeated by mere chance that carries probative weight, the essence of this probative effect is the likeness of the instance. * * * * In short, there must be a similarity in the various instances in order to give them probative value,—as indeed the general logical canon requires (ante, § 33).

It is just this requirement of similarity which leaves so much room for difference of opinion and accounts for the bewildering variances of rulings in the different jurisdictions and even in the same jurisdiction and in cases of the same offence. 2 Wigmore § 302.

Professor McCormick states the considerations that must influence admissibility succinctly:

In this country, the danger of victimizing witnesses and of undue prejudice to the parties, has led most of our courts to recognize that this kind of cross-examination, though permitted, is subject to a discretionary control by the trial judge. Some of the factors, in addition to those of undue humiliation and unfair prejudice, already mentioned, which may, it seems, sway discretion, are (1) whether the testimony of the witness under attack is crucial or unimportant, (2) whether the misconduct inquired into is relevant to truthfulness, such as false swearing, fraud and swindling, or bears only on "general bad character" such as acts of violence or unchastity, (3) the nearness or remoteness of the misconduct to the time of trial, and (4) whether the matter inquired into is such as to lead to time-consuming and distracting explanations on cross-examination or re-examination. McCormick, supra, § 42.

█ These criteria make it doubtful that the state trial judge erred in his rulings. But even if he did, the error did not deprive the accused of his constitutional rights.

The importance of the right to effective cross-examination cannot be minimized. As the Supreme Court said, in Pointer v. State of Texas, 1965, 380 U.S. 400, 404–405, 85 S.Ct. 1065, 1068, 13 L. Ed.2d 923,

It cannot seriously be doubted at this late date that the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him. And probably no one, certainly no one experienced in the trial of lawsuits, would deny the value of cross-examination in exposing falsehood and bringing out the truth in the trial of a criminal case. See, e. g., 5 Wigmore, Evidence § 1367 (3d ed. 1940). The fact that this right appears in the Sixth Amendment of our Bill of Rights reflects the belief of the Framers of those liberties and safeguards that confrontation was a fundamental right essential to a fair trial in a criminal prosecution. Moreover, the decisions of this Court and other courts throughout the years have constantly emphasized the necessity for cross-examination as a protection for defendants in criminal cases.

\* \* \* \* \* \*

There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, we have expressly declared that to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law.

█ But the accused's right to cross-examine the witnesses against him does not embed Wellman on Cross Examination into the Constitution. It does not include the right to ask every relevant question, without limit. Nor does it require a constitutional reassessment of every question put in cross-examining a witness. Compare Dutton v. Evans, 1970, 400 U.S. 74, 91 S.Ct. 210, 27 L. Ed.2d 213, making a similar observation with respect to the hearsay rule.

Ultimately the rulings on the questions put to the Reverend Dyer concern

evidentiary matters that lie within the trial court's discretion. United States v. Smith, 5 Cir. 1970, 433 F.2d 1226; United States v. Cole, 8 Cir. 1971, 449 F.2d 194, 199. See McCormick, *supra*, § 29, Model Code of Evidence, Rule 105.

 "Although the right of cross-examination is absolute, it is not unrestricted; the scope of such examination may be limited by the trial judge in the exercise of his discretion." Jackson v. Beto, 5 Cir. 1968, 388 F.2d 409, 411. See also Sullivan v. Scafati, 1 Cir. 1970, 428 F.2d 1023. Compare Dixon v. United States, 5 Cir. 1964, 333 F.2d 348, 353 where the court dealing with abrupt curtailment or denial of the right to cross-examine, noted "[i]t is often stated that the control of cross-examination is within the discretion of the trial judge, but it is only after a party has had an opportunity substantially to exercise the right of cross-examination that discretion becomes operative."

Here, as in Woodington v. Mathews, 7 Cir. 1968, 401 F.2d 125, the case presented by the petitioner is precisely the same as that presented to the state court. "While binding weight need not be attached to the state court's determination, the federal court may accept such determination in the absence of a vital flaw." 401 F.2d at 126. However, if duty does compel re-examination of the state court's conclusions, the result is not altered. The witnesses against the applicant were physically present at the trial; they were cross-examined vigorously. The rulings on the two disputed questions, even if erroneous, did not deprive the accused of his constitutional right of cross-examination.

In sum, examination of the state court proceedings satisfies me that the requirements of *Townsend* and of the 1966 Amendments to the Habeas Corpus Act were met by the state proceedings. Hence the petition for habeas corpus must be denied.