Linroy DAVIS, Petitioner-Appellant,

v.

Louis B. HEYD, Sheriff, Respondent-Appellee.

No. 72–1512.

United States Court of Appeals,
Fifth Circuit.

May 29, 1973.

Robert Glass, New Orleans, La., (Court-Appointed), for petitioner-appellant.

Maurice R. Franks, Byron P. Legendre, Asst. Dist. Attys., Parish of Or-

leans, New Orleans, La., for respondent-appellee.

Before COLEMAN, GOLDBERG and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge:

This appeal is by Davis, a state prisoner under a 15-year sentence for manslaughter, from the denial of federal habeas relief.[1] The central legal issue is nondisclosure by the prosecution of evidence favorable to the petitioner and material to his guilt. The nondisclosed evidence consisted of written out-of-court statements by witnesses and photographs of petitioner, all taken shortly after the incident out of which the charge arose.[2] We reverse.

The death for which petitioner was convicted occurred in an affray between Davis on the one hand and Reverend Dyer and his sons Joseph, James, and John on the other. Following an earlier difficulty between Davis and members of the Dyer family, Reverend Dyer and his three sons sought out Davis at his mother's home. After words between Reverend Dyer and Davis a scuffle between them ensued, the three sons joined in, and during the scuffle Davis' pistol discharged, killing James Dyer. In this context the obvious possible defenses were self-defense and accident. Self-defense was not interposed, however, and no jury instructions on self-defense were requested.

Louisiana law does not require pretrial discovery of statements taken from potential witnesses.[3] According to

1. Davis was arrested July 26, 1966, for an alleged murder. The grand jury considered the case and returned "Not a true bill." Then the district attorney filed an information charging manslaughter. Almost two years later and just three days before the prosecution would have prescribed, La.Code Crim. P.Ann. art. 578, the case was set for trial. Trial commenced one day before the lapse of the time within which prosecution is permitted. The jury reached a verdict of guilty by a 10–2 vote.

2. Petitioner contended in the district court that the trial judge improperly limited the scope of defense counsel's cross-examination. That contention has been dropped on appeal. Also the issue of suppression of the photographic evidence has not been seriously pressed on appeal.

3. E. g., State v. Cardinale, 251 La. 827, 206 So.2d 510, 511–512 (La.1968), cert. dismissed, 394 U.S. 437, 89 S.Ct. 1161, 22 L.Ed.2d 398 (1969).

his affidavit, defense counsel learned of the statements following the trial, and in the offices of the district attorney, when he noticed them in the hands of one of the district attorneys. He filed a motion for a new trial, and the state then revealed the statements and photographs.

### 1. The affray

The Dyers found Davis at his mother's home, standing in the front doorway. Leaving his sons in the car and cautioning them to remain there, Dyer approached petitioner. Reverend Dyer's trial testimony was that after some brief words *on the porch*, Davis drew a gun from his pocket and aimed it at Reverend Dyer, Reverend Dyer grabbed him, a tussle ensued, and they fell into the living room. There Davis tried to throw Reverend Dyer down, but Reverend Dyer slung him onto the sofa. At that time, Reverend Dyer said, his three sons came to his aid. The four Dyers struggled with petitioner, who was on the sofa. Reverend Dyer heard but did not see the gun discharge. John Dyer took the gun from Davis. In addition to his testimony, Reverend Dyer gave a statement the evening of the shooting, but it did not differ materially from his trial testimony.

Joseph Dyer testified at trial that he saw Davis pull the pistol on his father while the two men were *on the porch*, after which a struggle began, and the three sons left the car and ran to the house. They found Reverend Dyer holding Davis on his back on the sofa, they tried to take the gun from Davis, but *with one hand free and no one holding his arm*, Davis aimed the gun at James and shot him.

Joseph and his father gave statements a few hours after the shooting. In his statement Joseph said that his father and Davis were standing on the porch, *he turned his head, and when he looked back they were tussling,* and they fell into the front room. *At this time,* Joseph saw Davis "coming out of his pock-

et with a gun," and "[w]hen he went to aim it . . . *James grabbed his arm and at this time [Davis] pulled the trigger.*" Joseph was the only witness to see the act of shooting.

John Dyer was in Germany in the armed forces at the time of trial and did not testify. He also had given a signed statement after the shooting and in it he stated that *while the two men were talking on the porch* he saw Davis back up and "go in his pocket." His brothers ran for the house while he was still in the car. All began tussling and all fell back in the house onto the sofa. When John reached the scene he saw Davis "come up with the gun," with his finger on the trigger. "*He was holding the gun with the barrell* [sic] *pointed up toward the ceiling. [Davis] started to bring the gun down and James grabbed him by the arm he had the gun in. I then heard the gun go off* and I grabbed him by the arm and put his arm back and took the gun away from him."

Petitioner Davis testified that Reverend Dyer grabbed him and in the ensuing struggle they fell on the floor and Reverend Dyer was choking him. The brothers came in and began kicking him, hitting him in the head, and beating him. His pistol had been stuck in his belt. In the struggle it slipped from his belt and he got it in his hand, how he did not know. He had a finger on the trigger and was attempting to put the safety on with his thumb, they were trying to jerk the gun away from him, he was trying to hold it, and it discharged.

On direct appeal the Supreme Court of Louisiana held that there was no substantial inconsistency between the pretrial statements and the testimony at trial, and thus no unconstitutional suppression of evidence. The federal habeas court, D.C., 350 F.Supp. 958, based its denial of habeas relief on alternative grounds: first, the evidence before the habeas court was insufficient to overcome the presumption of correctness to be given to the state court's findings; second, if it was the duty of the habeas

judge to review the record anew, he would have to conclude that there was not error of constitutional dimension, the prosecution, at the worst, having only failed to divulge material that might have assisted in cross-examination.

### 2. Standard of review

 Pursuant to 28 U.S.C. § 2254(d) factfindings by a state court are as a general rule presumptively valid in federal habeas proceedings brought by a state prisoner.[4] The federal habeas court, however, is not bound by the state court's interpretation of the relevant constitutional law. As Justice Frankfurter wrote in Brown v. Allen, 344 U.S. 443, 506–507, 73 S.Ct. 397, 446, 97 L.Ed. 469, 515 (1953):

> . . . State adjudication of questions of law can not, under the habeas corpus statute, be accepted as binding. It is precisely these questions that the federal judge is commanded to decide.

> . . . . . .

> . . . Where the ascertainment of the historical facts does not dispose of the claim but calls for interpretation of the legal significance of such facts . . . the District Judge must exercise his own judgment on this blend of facts and their legal values. Thus, so-called mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication with the federal judge.

Accord, Townsend v. Sain, 372 U.S. 293, 318, 83 S.Ct. 745, 9 L.Ed.2d 770, 789 (1963); West v. Louisiana, 478 F.2d 1026 (CA5 1973).

In this case the ultimate question is whether the prosecution failed to disclose evidence so material to the guilt or innocence of the accused that he was denied a fair trial under the teachings of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and related cases. The habeas court reasoned that the out-of-court statements would satisfy the appropriate standard of materiality only if, as a threshold matter, they were inconsistent with the in-court testimony of the Dyers. Thus in explaining the state court's analysis, the federal court stated, "Here the determination of the state court was twofold: first, the statement was not inconsistent with the trial testimony; second, if it was, the difference was not sufficient to make non-production prejudicial." The threshold issue of consistency, the federal habeas court stated, was a question of fact: "What is 'consistent' or 'inconsistent' . . . is a complex question, but it is basically one that involves 'the merits of the factual dispute.'" The habeas court therefore accorded the state court's "finding" of consistency a presumption of validity, then ruled that the presumption had not been overcome, and consequently never seriously considered the ultimate legal question of whether the suppressed statements were material to petitioner's guilt or innocence. To determine whether the habeas court correctly perceived its standard of review,

---

4. Exceptions to the general rule are specified in 28 U.S.C. § 2254(d).

For example, there is no presumption of validity if "the merits of the factual dispute were not resolved in the State court hearing," or "the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing," or "the Federal court on a consideration of . . . the record as a whole concludes that [the] factual determination is not fairly supported by the record." See generally Farmer v. Caldwell, 476 F.2d 22 (CA5, 1973). Section 2254(d) substan- tially codifies the standards of Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), in which the Supreme Court held that federal redetermination of disputed facts was mandatory "unless the state-court trier of fact has after a full hearing reliably found the relevant facts." Id. at 313, 83 S.Ct. at 757, 9 L.Ed.2d at 785. See LaVelle v. Delle Rose, 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637, 12 Cr.L. 4187 (March 19, 1973); Procunier v. Atchley, 400 U.S. 446, 451 n. 6, 91 S.Ct. 485, 27 L.Ed.2d 524, 529 n. 6 (1971).

we must briefly review the distinction between law and fact.

To assist in drawing the distinction Professor Morris has suggested as tests: "A question of fact usually calls for proof [whereas a] question of law usually calls for argument," Morris, Law and Fact, 55 Harv.L.Rev. 1303, 1304 (1942), and "When there is but one account of what happened, and the application of law to that account is problematical, a question of law results," *id.* at 1314–1315 (crediting Holmes for the rule).[5] More to the point the Supreme Court in Townsend v. Sain, *supra,* the precursor of § 2254(d), defined the term "fact" in the following manner:

> By "issues of fact" we mean to re-fer to what are termed basic, primary, or historical facts: facts "in the sense of a recital of external events and the credibility of their narrators . . . ." Brown v. Allen, 344 U.S. 443, 506, 73 S.Ct. 397, 446, 97 L.Ed. 469 . . . (opinion of Mr. Justice Frankfurter). So-called mixed ques-tions of fact and law, which require the application of a legal standard to the historical-fact determinations, are not facts in this sense.

372 U.S. at 309 n. 6, 83 S.Ct. at 755 n. 6, 9 L.Ed.2d at 783–784 n. 6.[6] In illustra-tion of its distinction between fact and law the Supreme Court has stated that the question whether a confession is vol-untary is ultimately a question of law. Thus the Court has explained that in the typical case in which a confession is at-tacked as involuntary, a trier of fact must initially re-create the external events preceding the confession, such as length of questioning, use of drugs, use of physical force, or use of coercive psy-chological tactics. Against the factual composite re-created a tribunal must ap-ply the appropriate legal standard to de-termine if the confession is voluntary within the meaning of the Constitution. This process is discussed in depth in Cu-lombe v. Connecticut, 367 U.S. 568, 603–606, 81 S.Ct. 1860, 6 L.Ed.2d 1037, 1058–1060 (1961). Accord, LaVelle v. Delle Rose, 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637, 12 Cr.L. 4187 (March 19, 1973); Townsend v. Sain, *supra;* Brown v. Allen, *supra,* 344 U.S. at 507, 73 S.Ct. 397, 97 L.Ed. at 515. In an analogous context this court has recently held that the issue of effective assistance of counsel calls ultimately for a legal determination:

> The precise issue of whether a partic-ular defendant enjoyed "effective" as-sistance of counsel, is, in the end . . . a question of law . . . [T]here is a legal standard, by defini-tion normative and prescriptive, which must be applied to a particular set of facts in order to determine whether an accused received effective assist-ance of counsel.

Walker v. Caldwell, 476 F.2d 213 (CA5 1973) (emphasis original). Also the due process question of impermissible suggestiveness—sometimes implicated in criminal trials preceded by such identifi-cation procedures as showups, photo dis-plays, or lineups—similarly requires ap-plication of a constitutional standard to elemental facts. Neil v. Biggers, 409

---

5. Wigmore draws the distinction in the following terms:

 "Given certain facts or groups of facts, and the State predicates a jural rela-tion between A and B, *i. e.,* is ready to lend its force towards a more or less direct realization of that relation. The establishment of a given claim, then, involves the demonstration (1) that certain facts or groups of fact exist, (2) that to the contingency of their existence the State attaches the legal consequences now asserted by the claimant."
 1 Wigmore, Law of Evidence § 1, at 2 (3d ed. 1940).

6. We agree with the conclusion of Imbler v. California, 424 F.2d 631 (CA9 1970), that the draftsmen of the 1966 amend-ments to 28 U.S.C. § 2254 used the term "factual issue" in the same sense as it was used in Townsend v. Sain.

U.S. 188, 193 n. 3, 93 S.Ct. 375, 379 n. 3, 34 L.Ed.2d 401, 407 n. 3 (1972).[7]

The question of materiality present in cases in which the accused complains of prosecutorial suppression of material evidence is of the same category as the issues of voluntariness, effective assistance of counsel, and impermissible suggestiveness. They are all mixed questions of law and fact calling ultimately for a legal determination. In this case, as the habeas court correctly recognized, the legal question of materiality arises only if the nondisclosed evidence is determined to be inconsistent with the trial testimony, but we feel that the consistency issue is also one of law and therefore not entitled to a § 2254(d) presumption of validity. As a general observation it would seem artificial to treat it differently from the question of whether the prosecution failed to disclose material evidence, because both questions are inextricably intertwined with each other. More importantly, the facts *vel non* are not in dispute. We know what the statements said, and we know what the witnesses said at trial. The initial task is only to compare the transcribed content of the Dyers' trial testimony with the transcribed content of their out-of-court statements and then to determine if they are inconsistent. The issue is not factual under any traditional definition of the term "fact". Its resolution does not require proof instead of argument; it does not involve reconstruction of historical facts; it does not require a finding as to the intent of the witnesses who signed the statements; nor does it require credibility choices based on the demeanors of the witnesses.

The policies underlying § 2254's presumption of factual validity fully support the conclusion that the consistency issue is one of law. For example, the principle that federal habeas courts should defer to a state judge's credibility choices is not violated by de novo review of the consistency issue in this case —credibility choices are not required in measuring the transcribed out-of-court statements against the recorded trial testimony. Also, in many § 2254 proceedings the state court's factfindings are likely to be more accurate than those of a federal court because they are made closer in time to the historical event. The danger of decreasing accuracy is not present in this case, however, because the testimony and statements have been transcribed, and it is only their relationship to each other that is in question. Nor is there a threat of needless expenditure of federal judicial resources in historical factfinding, since in this case consistency between the statements and testimony can be determined without an evidentiary hearing. See generally Developments—Federal Habeas Corpus, 83 Harv.L.Rev. 1038, 1113–54 (1970). The Louisiana Supreme Court itself seemed to treat the consistency issue as one of law. On an independent review of the evidence it ruled that the statements were consistent with the trial testimony without questioning the propriety of making such a finding at the appellate level. We therefore conclude that our review is not constricted by presumptions of validity and turn to the merits of Davis' petition.

### 3. Material inconsistency

With deference to both courts, we are compelled to say that their conclusions cannot stand under the scalpel of constitutional scrutiny. The Louisiana Supreme Court made these important rulings.[8] (1) The statements were "essentially the same" as the trial testimony of Reverend Dyer and Joseph,

7. Our list of various so-called mixed questions of fact and law is, of course, not exhaustive. The distinction between fact and law has been the subject of extensive commentary, and many of the more classic writings are referenced in Professor Morris' article cited in text.

8. The opinion of the Louisiana Supreme Court is reported at 259 La. 35, 249 So.2d 193.

which was that after Reverend Dyer remonstrated with Davis then Davis drew a gun, following which the four Dyers scuffled to disarm him. (2) The pretrial statements of Reverend Dyer and John were almost identical to the foregoing trial version. (3) Although in his testimony Joseph said the pistol was drawn on the porch, whereas in his statement he had said it was drawn inside the house after the fight was in progress, this was a "seeming inconsistency" which "might possibly be explained as a matter of imperfect articulation trying to describe the moment when Joseph observed the gun being aimed at his brother." And, assuming the inconsistency was not mere "imperfect articulation" concerning when the gun was aimed, nevertheless Joseph's pretrial statement, "in essential outline," did not differ from the trial testimony which was that the accused drew his gun while arguing with Reverend Dyer and that the Dyers' only object was to disarm him and turn him over to the police. (4) Failure to disclose John's pretrial statement, which might have afforded grounds for a continuance, was not prejudicial because, as the Supreme Court construed his statement, it did not tend to support the theory of accidental discharge. As the court construed the statement, John was saying that Davis was bringing the gun down to shoot one of the Dyers when James grabbed his arm and the gun then fired.

Ruling (3) relates to Joseph's statement. At trial Joseph specifically testified that Davis pulled the gun from his pocket while Davis and Reverend Dyer were arguing *on the porch,* following which a struggle ensued that carried into the living room. This account corroborated the testimony of Reverend Dyer and tended to make Davis the aggressor. It contradicted the testimony of Davis, who contended that he did not draw the gun on the porch, but had somehow picked it up when it slipped from his belt during the struggle. In his statement, however, given only a few hours after the shooting, Joseph said—

in direct opposition to his trial testimony—that the gun was drawn *inside the house after the scuffle was in progress.* The version in the statement corroborated the testimony of Davis, contradicted the testimony of Reverend Dyer, and tended to show Reverend Dyer as the aggressor. We confess our inability to understand how this inconsistency relating to when the gun was *drawn,* can be viewed as an "imperfect articulation" of when the gun was *aimed* at James. If drawn on the porch, the gun was drawn at a time when the three brothers were seated in the car some distance away, and no one says it was then aimed at James. The alternative explanation by the Supreme Court—that Joseph's testimony did not differ from the trial version that Davis drew while arguing with Reverend Dyer and that the Dyers' only objective was to disarm him—is no more tenable. This cannot be squared with Joseph's statement that the gun was drawn inside the house and after the fight was in progress.

In an additional respect not mentioned by the Louisiana Supreme Court Joseph's statement contradicted the Dyers' trial version of the struggle. At trial Joseph said that Davis, with his hand free and no one holding his arm, aimed at James and shot him.

Q. Describe exactly what the defendant did with the gun.

A. The defendant, after he told his mother to move back out of the way, he was laying on the sofa and then he aimed the gun [at] my brother and shot him.

Q. At the time that he aimed the gun, was anybody holding his arm?

A. No, he had one of his hands free.

Q. He had one hand free?

A. Yes, he did.

In contrast Joseph said in his statement, "When he went to aim it . . . James grabbed his arm and at this time [Davis] pulled the trigger." This statement corroborated Davis' contention that the gun had accidentally discharged

when the Dyers tried to jerk it from his hand, and contradicted the Dyers' trial version that Davis had, with his arm free, intentionally shot James.

Rulings (2) and (4) bear on John's statement. The statement is not "almost identical" to the Dyers' trial version. According to his statement John did not see the weapon drawn on the porch but only saw Davis "go in his pocket." He fixed the position of the gun, when the struggle was occurring in the living room, as aimed at the ceiling and described the discharge as occurring when James grabbed Davis' arm. This statement both contradicted the Dyers' trial version that Davis, as the aggressor, drew the gun on the porch, and conflicted with Joseph's testimony that Davis' arm was free and that Davis aimed at James and shot him. Ruling (4) construes John's statement to be that "Davis was bringing the gun down *to shoot one of the Dyers* when James grabbed his arm." (emphasis added) The critical italicized phrase attributing to Davis an intent to shoot (and agreeing with Joseph's trial version that petitioner aimed at and shot James) is an interpolation. The statement contains no reference to Davis' intent.

Ruling (1) is a summary of the overall content of all the statements versus the trial testimony, and what we have already said covers it.

■ Under Supreme Court precedents the prosecution's failure to disclose these statements denied Davis his fourteenth amendment right to a fair trial. As the Supreme Court explained in Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972):

> As long ago as Mooney v. Holohan, 294 U.S. 103 [, 55 S.Ct. 340, 79 L.Ed. 791, 98 ALR 406] (1935), this Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with "rudimentary demands of justice." This was reaffirmed in Pyle v. Kansas, 317 U.S. 213 [63 S.Ct. 177,

87 L.Ed. 214] (1942). In Napue v. Illinois, 360 U.S. 264, [79 S.Ct. 1173, 3 L.Ed.2d 1217] (1959), we said "the same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Id., at 269 [79 S.Ct. at 1177, 3 L.Ed.2d at 1221]. Thereafter Brady v. Maryland, 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963), held that suppression of material evidence justifies a new trial "irrespective of the good faith or bad faith of the prosecution." . . . When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within the general rule. . . . A new trial is required if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury. . . ."

*Id.* at 153, 92 S.Ct. at 766, 31 L.Ed.2d at 108. See also Moore v. Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972).

In this case the statements not disclosed were so material to guilt or innocence that they easily could have affected the verdict. They were, for example, material to the issue of whether Davis committed manslaughter, which is defined in Louisiana as "[a] homicide which would be murder . . . but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." La.Rev.Stat.Ann. § 14:31. The statements specifically corroborated Davis' defense of accidental discharge and specifically contradicted the Dyers' trial version of intentional killing in the heat of a struggle. In indicating that Davis was not the aggressor the statements would have been material to a plea of self-defense. Davis did not raise self-defense or request jury instructions on that issue. Under Louisiana law an aggressor may not claim self-defense unless he withdraws from

the conflict and his adversary knows or should know of the withdrawal. *Id.* § 14:21. At trial both Reverend Dyer and Joseph pictured Davis as the aggressor, while Davis described Reverend Dyer as the aggressor. Joseph's statement strongly substantiates Davis' version, and John's does also though to a lesser degree. With the full information available, defendant might have elected to plead self-defense.[9]

John's statement has an additional significance not possessed by the others. In Louisiana failure to produce a witness within a party's control raises a presumption that his testimony would not have aided the party. *Id.* § 15:432. To negative the presumption the prosecutor introduced the subpoena unserved on John because he was in Germany. The defense, with knowledge of his statement, could have moved for a continuance which, if granted, would have caused the prosecution to prescribe. La. Code Crim.P.Ann. art. 578.

Prior to motion for new trial Davis' trial counsel did not request disclosure of the out-of-court statements. Compare Brady v. Maryland, *supra* 373 U.S. at 87–88, 83 S.Ct. 1194, 10 L.Ed.2d at 218–219. Case-by-case development since *Brady* has made clear that a demand by defense counsel is not a uniform prerequisite to federal habeas relief based on the state's failure to disclose evidence material to guilt or punishment. See, e. g., Jackson v. Wainwright, 390 F.2d 288 (CA5 1968); Ingram v. Peyton, 367 F.2d 933, 936–937 (CA4 1966); Levin v. Katzenbach, 124 U.S.App.D.C. 158, 363 F.2d 287, 290 (CADC 1966); Barbee v. Warden, 331 F.2d 842, 845–846 (CA4 1964). See generally 8 Moore, Federal Practice ¶ 16.06[1]; at 16–66 to 16–67 (Cipes ed. 1972); Annot., 34 A.L.R.3d 16, 32–38 (1970). In this case the state does not argue that absence of a demand vitiates the constitutional challenge based on nondisclosure of material evidence. Petitioner's trial counsel did re-

quest disclosure, in part because, as he explained in a post-trial affidavit, he did not know the statements existed. The evidence in question was in the state's possession and it was so material to guilt that it "could scarcely have failed to attract and sustain prosecutorial awareness." United States v. Keogh, 391 F.2d 138, 147 (CA2 1968). Under these circumstances ritualistic imposition of a requirement to request unknown evidence would further no useful policies, but would instead undermine the constitutional guarantee to a fair trial.

### 4. Section 2254(d)(8)

28 U.S.C. § 2254(d)(8) provides that a state court finding of fact is not to be presumed correct if "the Federal court on a consideration of . . . the record as a whole concludes such factual determination is not fairly supported by the record." Even if the rulings of the Louisiana Supreme Court are viewed as findings of fact, we would nevertheless hold, for reasons apparent from our preceding discussion, that the record as a whole does not support those rulings and that petitioner has established "by convincing evidence that the factual determination[s] by the State court [were] erroneous." *Id.* § 2254(d).

### 5. Conclusion

The judgment of the District Court is reversed and the cause remanded with instructions that the writ issue, subject to the State of Louisiana's right to retry petitioner within a reasonable time.

COLEMAN, Circuit Judge (dissenting):

I respectfully dissent.

It is to be regretted, I think, that in this collateral attack on a Louisiana manslaughter conviction the majority opinion is likely to have far-reaching future consequences for the federal courts in this Circuit.

---

9. This effect of the inconsistencies as making self-defense a strong or a weak de-

fense was not touched on by the Supreme Court or the habeas court.

The majority opinion quite correctly states that under 28 U.S.C. § 2254(d) factfindings by a state court are as a general rule presumptively valid.

It then proceeds to knock a great hole in the statute by holding that an appraisal of asserted factual inconsistencies in the case now before us is *a question of law not of fact.* In my view this puts us right back where we were before § 2254(d) was enacted. It means that in the future the federal courts will have to "retry" similar inconsistencies as questions of law, thus adding to the hopeless mound of litigation under which we are presently smothered. I personally believe that a comparison of facts is just another question of fact and that under § 2254(d) the judgment of the District Court should have been affirmed *per curiam.*

Moreover, there were no material or prejudicial inconsistencies in the statements, even if we are to weigh them legally rather than factually. By all means, there was not such inconsistency as would have required the State *sua sponte* to have tendered them to the defense.

The opinion of the District Court [Judge Alvin B. Rubin] is reported, 350 F.Supp. 958–971. In an unusually thorough analysis of Davis' claims Judge Rubin found no federal constitutional grounds for relief. I unhesitatingly agree.

As to the background, I feel that I can do no better than to quote from Judge Rubin's published opinion, 350 F. Supp., beginning at 960:

"The applicant was convicted of manslaughter in Louisiana state court on September 20, 1968. A motion for a new trial was made by his court-appointed counsel, but was denied by the trial court. Evidentiary material was attached to the state's response to the application for a new trial. Counsel for the defendant filed a motion for appeal, but failed to perfect the appeal, submit a brief, or appear for argument. Almost two years later, represented by new counsel, the applicant sought a writ of habeas corpus in state court, alleging denial of an effective appeal, and requested relief by way of an out-of-time appeal. The state court granted an out-of-time appeal. The evidentiary material attached to the state's response to the application for a new trial was presented to the Louisiana Supreme Court on the appeal. The issues raised in the state courts, which are the same as those now urged as bases for a federal writ of habeas corpus, were that Mr. Davis had been convicted in violation of the due process and confrontation clauses of the United States Constitution because the state had withheld the pre-trial statements of witnesses and photographs that both supported his defense and contradicted the testimony of major State witnesses, and further because, by sustaining objections to two questions put by defense counsel to one of the state's witnesses, the State trial judge had denied Mr. Davis the right of cross-examination.

"On June 7, 1971, the Louisiana Supreme Court decided both issues adversely to the appellant and affirmed his conviction, State v. Davis, 1971, 259 La. 35, 249 So.2d 193.

"In order to understand the issues, it is necessary to review the events before and during the trial in state court.

"New Orleans police arrested the applicant, Linroy Davis, for the murder of James Dyer on July 26, 1966. The Grand Jury return was 'Not a true bill'. Then the Orleans Parish District Attorney filed an information charging manslaughter. Almost two years later, and just three days before the prosecution would have prescribed, LSA–C.Cr.P. art. 578, the case was set for trial. After being continued, the trial commenced one day before the lapse of the time within which prosecution is permitted. The jury returned a verdict of guilty by a 10–2 vote. The events recounted at the trial were these:

"On Sunday, July 24, 1966, Linroy Davis, who was in an automobile with

another man, spoke from the car to Miss Brenda Mae Dyer, a sister of the deceased, in front of the deceased's home. Mr. Davis and Miss Dyer were not acquainted. When James Dyer, the deceased, went to Davis' car to protest Mr. Davis' remarks to his sister, Mr. Davis got out of the auto and slapped Mr. Dyer on the side of his head with a pistol. Miss Dyer picked up a brick to throw at Mr. Davis, but Mr. Davis returned to his automobile and drove off, pointing the pistol at her. Mr. Davis circled the block and, seeing the decedent's twin brother, pointed the gun at him and drove off.

"Later that afternoon the Dyers' father, the Reverend John Dyer, a minister, returned from church. His family told him of the events that had just occurred, and he drove in an automobile with his sons, James, Joseph, and John, looking for Mr. Davis. He saw a car that he recognized as Davis' from the description, and, as he drove up, he saw Mr. Davis standing in the doorway of the house in front of which the car was parked. The Reverend Dyer left his sons in the car and walked up to Mr. Davis.

"Much of the testimony of the Davis trial consisted of varying accounts of what happened thereafter. The Reverend Dyer testified his objective was to 'reform the boy;' after the conversation began, Mr. Davis pulled out a gun; he tussled with Mr. Davis; his sons came to his aid; the gun went off; and James Dyer was shot. Joseph Dyer's testimony was substantially in accordance with his father's. John Dyer was absent in the armed forces, stationed in Germany, and did not testify.

"The defense called the defendant's mother who testified that she came into the room before the shot was fired, and that, in effect, the Dyers were the aggressors in the fray then going on. Mr. Davis testified that the Reverend Dyer grabbed him and, in the struggle they fell to the floor. The older man began to choke him. Then the other Dyers

joined in the fray. He managed to grab the gun, the Dyers tried to take it away, and it went off. Other witnesses confirmed parts of these accounts.

"The Dyers were subjected to vigorous cross-examination by appointed counsel who was then defending Mr. Davis. When the state answered the defense motion for a new trial in 1968, defense counsel learned for the first time that the District Attorney had taken written statements from the Dyers before the trial and also had three photographs of the accused taken shortly after the fray. The failure to produce these at the trial is the basis of the first claim by the applicant.

"These statements and photographs were before the state Supreme Court when it heard Mr. Davis' out-of-time appeal. Counsel for the applicant was offered an opportunity to file additional evidence in this court. However, no evidence has been offered that was not adduced at the time of the second state appeal, except an affidavit by applicant's former counsel that he didn't know of the existence of the written statements and photographs until after the trial; 'the statements would have been extremely helpful if not crucial for the defense of Davis at the trial;' they were 'essential to a fair trial;' and he believed that with them, he could have obtained a verdict of acquittal."

This ends the quotation from Judge Rubin's reported opinion.

### MY DISSENTING VIEWS

What kind of manslaughter case was this?

The defense of self-defense was not interposed and there were no jury instructions on self-defense.

Therefore, the only available defense was that the killing was *accidental* and this was the defense on which the case was tried.

With this beginning, I would weigh this appeal in the light of the following:

1. Judge Rubin found that "The State did not use perjured testimony,

did not suppress truth, it did not knowingly foist error on the jury", 350 F. Supp. at 968;

2. In the State Court, trial counsel made no request for any pre-trial statements made by the Dyers. Reverend John Dyer and Joseph Dyer took the witness stand and were vigorously cross-examined but they were not asked, *even then,* if they had given any pretrial statements. If counsel had asked for such statements and if they had been furnished what could they have been used for? Obviously, for attempted impeachment only and there was not enough material inconsistency to support impeachment of any worthwhile vitality.

The majority opinion concedes that there were no "inconsistencies" on the part of Reverend John Dyer, so as to his testimony his prior statement would have been wholly useless.

That narrows the controversy, so far as the trial was concerned, to alleged inconsistencies of *federal constitutional dimensions* between Joseph Dyer's pretrial statement and his testimony. The Supreme Court of Louisiana found that the statements were "essentially the same". The majority applies its views to the facts and overturns the findings of the Louisiana Supreme Court, as well as those of the Federal District Court. In my view, the findings are not erroneous; indeed, I agree that they are right.

In his pre-trial statement Joseph Dyer said that the shooting took place in the house. At the trial he said the same. In his pre-trial statement Joseph said that he saw Davis coming out of his pocket with a gun and when he went to aim it James Dyer (the deceased) grabbed his arm *(without saying which arm)* and at this time Davis pulled the trigger. At the trial, Joseph testified that the Dyers tried to take the gun from Davis while Reverend Dyer was holding him on the sofa in the house. However, with one hand free and no one holding his arm (presumably his shooting arm) Davis aimed the gun at James Dyer and shot him. The question is:

*which arm was which?* How much impeachment could this have provided? Very little, I daresay.

So, for this minor evidentiary hang-up the Court of Appeals steps in once again to void a state conviction after the State Supreme Court and the United States District Court have held otherwise on the same, identical point. This is particularly regrettable when one recalls that defense counsel never attached enough importance to possible prior statements to ask for them. I doubt, too, that the state prosecutor is to be faulted for not furnishing them *sua sponte,* when two courts have agreed that there existed no material inconsistency.

The majority opinion surmises that if Davis or his counsel had known of the allegedly inconsistent prior statements of Joseph Dyer and John Dyer, the younger, they *might have* pleaded self-defense. This flies in the face of facts which the majority opinion does not mention. Shortly before the fatal difficulty, at another place, at a time when he could have been in no real or apparent danger of death or great bodily harm, Davis, the defendant, had slapped James Dyer, whom he later killed, on the side of the head with a pistol. Then he pointed the weapon at Brenda Mae Dyer. Still later he pointed it at another Dyer brother. Furthermore, Davis admitted that from the beginning of the fatal encounter he had the pistol in his belt. At the time of the shooting the Dyers were unarmed. All this makes very poor food for thoughts of self-defense. It also negates the proposition that the same man who met the visitors with pistol in belt committed an accidental homicide, and that is true regardless of whether he pulled the pistol on the porch or after they got in the house. The whole truth is that the deadly encounter ended within two or three minutes of its inception and testimonial inconsistencies in such a situation are known by experience to be the rule rather than the exception.

It is further said, however, that the defense *might have* asked for a continuance had it known of the prior statement

of John Dyer, the younger, then in Germany. I think it is only reasonable to suspect that such a motion would have been denied. The statement could have been used only to impeach him, but he did not testify. Moreover, his testimony would have been purely cumulative. The record provides no basis for assuming that John would have testified as per his prior written statement, even if it were inconsistent. My educated guess is that the defense was glad that John, Jr. was "across the waters" and thus unable to assist the prosecution.

For two reasons, I would affirm the judgment of the District Court:

1. Section 2254(d) has been satisfied, adversely to the appellant;

2. As a matter of fact, not as a matter of law, the allegedly inconsistent statements were not so materially inconsistent, if inconsistent at all, as to have required the state prosecutor to have tendered them *sua sponte*.

Again with deference, I am of the opinion that the majority has in effect retried this sudden, swirling, quickly completed physical encounter, a function which belonged entirely to the Louisiana courts.

I respectfully dissent.