**Warren GARRISON, Petitioner-Appellee,**

v.

**Ross MAGGIO, Jr., acting warden, Respondent-Appellant.**

**No. 75–2798.**

United States Court of Appeals, Fifth Circuit.

Oct. 22, 1976.

Rehearing and Rehearing En Banc Denied Dec. 2, 1976.

Joseph B. Tosterud, Jr., William Brockman, Asst. Dist. Attys., New Orleans, La., for respondent-appellant.

F. Irvin Dymond, William L. Crull, III, New Orleans, La., for petitioner-appellee.

Before WISDOM, COLEMAN and GEE, Circuit Judges.

GEE, Circuit Judge:

Warren Garrison is serving a 99-year sentence in Louisiana on a 1968 conviction for armed robbery. After exhausting his state remedies, Garrison filed this federal habeas corpus action. Looking simply to the record in the state proceedings, the district court granted relief on the theory that the prosecutor's failure to provide Garrison with certain material violated the requirements of due process enunciated in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). We reverse.

The material which was not disclosed to the defense was a supplementary police report which summarizes an interview between an investigating officer and the armed robbery victim. This report describes the first of the robbers as being "about 6′1″," having a "slender build," and wearing a white shirt and khaki pants. It also indicates that this robber beat the victim with a shovel. The other robber is described as "shorter" and "stocky." At trial, the victim made a positive identification of Garrison. His description of Garrison's clothing and his role in the robbery correspond to that attributed to the first suspect in the police report. But Garrison is about

five feet, five inches in height and stocky in build, so his physical stature is completely inconsistent with that assigned to the first suspect in the police report. The victim also indicated at trial that he had given a description of the robbers to the police which paralleled his testimony on the stand. At no point in the proceedings has either the victim or the officer who prepared the supplementary report testified to its accuracy.

Garrison's trial counsel was unaware of the report, and he did not seek pretrial discovery or request Brady material.[1] The report was found in the official police department records when they became public after the conviction, but the prosecutor, testifying in the state habeas action, did not remember whether the report had been in his trial file. We assume without deciding that the prosecutor actually possessed and read the report before Garrison's trial.[2]

■ Our analysis commences with the recognition that the district court's assumption that *Brady* and *Giglio* are applicable here is erroneous. The former involves prosecutorial suppression, after specific request by the defense, of evidence favorable to the defense on either guilt or punishment, while the latter involves prosecutorial tolerance of perjured testimony. It is recent Supreme Court teaching that the

elements of the potential due-process violation arising from prosecutorial nondisclosure vary with the factual circumstances. *See United States v. Agurs,* —— U.S. ——, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). *Agurs* employs three distinct categories of cases to delineate the due process issues in this area; *Giglio* falls in the first analytic category, *Brady* in the second, and *Agurs* itself is the leading case in the third category. *Id.* at ——, 96 S.Ct. 2392.

Despite Garrison's citation of *Giglio*, he does not seriously argue that this case involves a knowing failure to correct false testimony, and we do not consider his potential *Giglio* claim to be before us on this appeal. There being no specific defense request for the undisclosed evidence, this case therefore falls in the same category as *Agurs*—it involves a prosecutor's failure voluntarily to disclose evidence favorable to the defense.

■ *Agurs* states that such a nondisclosure is a constitutional error only when the undisclosed evidence creates a reasonable doubt about defendant's guilt which did not otherwise exist. *Id.* at ——, 96 S.Ct. 2392.[3] Although the prosecutor's conduct here corresponds to that in *Agurs*, the factual differences in the cases justify application of a more stringent standard. A case such as this one, where the undisclosed evi-

---

**1.** Under Louisiana law, he would not have been entitled to the police report. *E. g., State v. Cardinale,* 251 La. 827, 206 So.2d 510 (1968), *cert. denied,* 394 U.S. 437, 89 S.Ct. 1162, 22 L.Ed.2d 398 (1969).

**2.** Applying the presumption of 28 U.S.C. § 2254(d), the district court accepted the state habeas court's findings that the prosecutor did not know of the report and that it was not in his file before or during trial. These findings are tainted, however, by the state court's misunderstanding of the prosecutor's testimony, revealed by its incorrect statement that the prosecutor testified he had never seen the police report and did not know of its existence before or after trial. In fact, he testified merely that he did not remember whether he had seen it before or whether it had been in his file. The only fact suggesting that he had not read this report, as he read the other reports in the case, is its absence from the prosecutor's file when it was produced years later at the state hearing.

On the other hand, there is convincing evidence that the prosecutor had read the supplementary report. His notes on his own pretrial interview with the victim contained a notation that a remark attributed to one of the robbers was "same as report." The only one of the three police reports which contained this remark was the supplementary report at issue here. Our *statement in text is equivalent to assuming without deciding that the state findings are not fairly supported by the record.* See 28 U.S.C. § 2254(d)(8) (1970); *Townsend v. Sain,* 372 U.S. 293, 313, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). In view of our disposition of this case, this extraordinary assumption is justified because it permits us to avoid complicated issues about the duty of the police to furnish the prosecutor with all the evidence generated by their investigation.

**3.** It likewise equates a general request with the no-request situation presented here.

dence is useful only for impeachment, is significantly different from one like *Agurs*, where the undisclosed evidence was pertinent to the merits of a self-defense claim. Requiring a prosecutor to disclose substantive evidence always enhances the search for truth and maintains or increases the amount of evidence available to the trier of fact. But requiring a prosecutor to volunteer impeachment evidence about his witnesses entails the risk that government witnesses will be less open with the prosecutor or may even refuse to testify voluntarily. Thus, forcing disclosure of impeachment matter may actually inhibit a full presentation to the trier of fact. It may be that existing precedent in this circuit does not leave us free to rule that the duty to volunteer evidence does not extend to purely impeaching evidence.[4] We believe, however, that we are free after *Agurs* to hold that an even stricter standard of materiality, one requiring petitioner to demonstrate that the new evidence probably would have resulted in an acquittal, is appropriate before a new trial must be granted for the nondisclosure of purely impeaching evidence. Adoption of this strict standard, the same applied to motions under Fed.R. Crim.P. 33 for a new trial based on newly discovered evidence, still gives special significance to the prosecutor's obligation to serve the cause of justice because it represents a relaxation of this circuit's general rule that newly discovered evidence useful only for impeachment never requires a new trial. *E. g., United States v. Rodriguez*, 437 F.2d 940 (5th Cir. 1971).

■ By this standard, Garrison's cause must fail. But even under the reasonable-doubt standard of *Agurs*, the supplementary report does not pass the test. The contents of the report are not in themselves exculpatory. The report merely indicates that the victim *may* have previously offered a somewhat different version of the crime. In view of the facts that the victim's trial identification was unequivocal and that the report summarizes an interview conducted while the victim was still in the hospital recovering from severe injuries, the report does not raise a reasonable doubt about Garrison's guilt.[5]

■ As the Supreme Court noted, the ultimate issue is whether the prosecutor's omission is of sufficient significance to result in a denial of the defendant's right to a fair trial. *United States v. Agurs, supra* at ——, 96 S.Ct. 2392. The inevitable uncertainty about the impact of impeachment matter means that such evidence can very rarely clear the bar, and consequently a prosecutor is seldom required to volunteer it to the defense.

REVERSED.

WISDOM, Circuit Judge (dissenting):

I respectfully dissent.

First, I disagree with the strict standard of materiality the majority promulgates for determining whether the prosecution's nondisclosure of "purely impeaching" evidence requires a new trial. Second, I cannot agree that a police report, in which the victim and sole eyewitness of the crime describes the robber who beat him in terms drastically inconsistent with his testimony at trial, is "purely impeaching" evidence. Finally, I believe that under the proper materiality standard, the petitioner in this case is entitled to relief.

I.

In *United States v. Agurs*, 1976, —— U.S. ——, 96 S.Ct. 2392, 49 L.Ed.2d 342, the

---

4. In *Davis v. Heyd*, 479 F.2d 446 (5th Cir. 1973), we anticipated *Agurs'* ruling that the absence of a request is not fatal to a *Brady* claim. We reversed a district court which had relied in part on the fact that the undisclosed evidence, including a prior inconsistent statement of a prosecution witness, was useful only for cross-examination. Although the standard of materiality used in *Davis* is inconsistent with *Agurs* and that aspect of *Davis* is therefore overruled, it is maintainable that nothing in *Agurs* permits reevaluation of the scope of the duty to volunteer established by *Davis*.

5. Garrison does not specifically seek resentencing on the theory that the report is material to his punishment. We intimate no view on the merits of such an argument or on whether Garrison has exhausted his state remedies as to it.

Supreme Court set forth the standard of materiality that triggers a prosecutor's duty to disclose voluntarily exculpatory evidence to the defense. The Court held that such disclosure is required when the "evidence creates a reasonable doubt that did not otherwise exist." —— U.S. ——, 96 S.Ct. at 2401, 49 L.Ed.2d at 355. In formulating this standard, the Court explicitly rejected the notion that the harsh materiality standard applied in evaluating motions for new trial under Fed.R.Crim.P. 33—the standard which the majority today adopts with respect to prosecutorial nondisclosure of impeaching evidence—should be applied to exculpatory evidence within the prosecution's control.

> [T]he fact that such evidence was available to the prosecutor and not submitted to the defense places it in a different category than if it had simply been discovered by a neutral source after trial. For that reason the defendant should not have to satisfy the severe burden of demonstrating that newly discovered evidence probably would have resulted in acquittal. If the standard applied to the usual motion for a new trial based on newly discovered evidence were the same when the evidence was in the State's possession as when it was found in a neutral source, there would be no special significance to the prosecutor's obligation to serve the cause of justice.

—— U.S. ——, 96 S.Ct. at 2401, 49 L.Ed. at 354 (footnote omitted).

1. *Giglio* held that where the prosecution knows or should know that testimony going to the credibility of a key prosecution witness is inaccurate, and the prosecution fails to correct such testimony at trial, a conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108. See *United States v. Agurs*, —— U.S. ——, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342, 349–50. The majority finds the strict holding of *Giglio*,—including the lower materiality threshold that case requires for reversal—inapplicable here. After reading the record, I must agree. The following colloquy took place during the defense cross-examination of James H. Pfister, the victim of the robbery and the prosecution's key witness.

Although the Court in *Agurs* spoke only to the nondisclosure of exculpatory evidence, the above reasoning loses none of its cogency when applied to the nondisclosure of impeaching evidence. In its decisions dealing with the prosecution's duty with respect to evidence favorable to the defense, the Supreme Court has repeatedly recognized that critical impeachment evidence may play as large a role in determining the outcome of a trial as exculpatory evidence. *Giglio v. United States*, 1972, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104; *Giles v. Maryland*, 1967, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737; *Napue v. Illinois*, 1959, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217. See Note, Materiality and Defense Requests: Aids in Defining the Prosecutor's Duty of Disclosure, 59 Iowa L.Rev. 432, 438 (1973). In *Giglio*, a promise of immunity to the government's key witness was not disclosed at trial. Even though the Assistant United States Attorney trying the case was unaware of the promise, the Court reversed the defendant's conviction. The Court observed:

> . . . *Brady v. Maryland* . . . held that suppression of material evidence justifies a new trial 'irrespective of the good faith or bad faith of the prosecution.' . . . When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule.

405 U.S. at 153–154, 92 S.Ct. at 766, 31 L.Ed.2d at 108.[1]

Q. Now, do you recall the description of the individual who put the gun on you, the one that held it in front of you, that stood in front of you? What was his physical description in general? Did you talk to the Police?

A. I talked to the Police, yes.

Q. What description did you give?

A. On the way to the hospital they were asking me as I was riding. They were asking me then, you know.

Q. What description did you give the Police?

A. I told the Police that he was—

Q. Which is he, which one?

A. Right here. I told them about the *other* fellow being about 5′ 10″ or 5′ 11″, and that the *other* fellow was shorter, that I imagined that he was about 5′ 4″ or 5′ 5″,

The majority reasons, in essence, that a stricter standard of materiality is warranted for the disclosure of impeaching evidence because such evidence, in "the search for truth", does not have probative value equal to that of substantive evidence. Although this is generally true, such logic misses the mark. Application of the same materiality standard to both impeaching and exculpatory evidence does not mean that these two types of evidence would be given equal weight in determining whether prosecutorial nondisclosure requires a new trial. Because impeachment evidence is less likely to give rise to a reasonable doubt than exculpatory evidence, its nondisclosure would serve as the basis for a new trial less frequently than the nondisclosure of exculpatory evidence even if the *Agurs* standard were applied to both types of evidence. Our focus should be on the *impact* of the undisclosed evidence on the state's case against the defendant, not on the *type* of evidence that the prosecution failed to release.

It is therefore unnecessary and unwise to impose a harsher standard of materiality on impeaching evidence than the Supreme Court applied to exculpatory evidence in *Agurs*. The *Agurs* standard is itself a strict one. I cannot acquiesce in the majority's view that due process is not violated where the prosecution fails to disclose evidence within its control [2] that "creates a reasonable doubt that did not otherwise exist" simply because the evidence is deemed "impeaching" rather than "exculpatory". The severity of the majority's materiality standard is demonstrated by the denial of

relief here; the elusive nature of the distinction between impeaching and exculpatory evidence, upon which this stricter standard is premised, is also illustrated by the facts in this case.

## II.

On December 2, 1967, two men robbed James H. Pfister, a real estate rental agent, while he was working in his company's office in New Orleans. One of the robbers severely beat Pfister with a shovel. In a police report made immediately following the crime, Pfister described the robber who beat him as 6' 1" tall and of slender build. This description is glaringly inconsistent with Pfister's trial testimony that Garrison, who is 5' 5" tall and stocky in build, was the robber who administered the beating. It was largely, if not solely, on the basis of Pfister's positive identification of Garrison at trial that Garrison was convicted of armed robbery and sentenced to 99 years in prison.[3]

The majority characterizes the discrepancy in Pfister's descriptions of his assailant as "purely impeaching evidence". I find this characterization untenable, given that Garrison's sole defense was an alibi. At trial, he testified that he was asleep in his sister's home during the entire morning the robbery took place. His story was corroborated by the testimony of his sister and her two daughters, all of whom testified that the defendant did not leave the house that day.[4] The undisclosed version of the robbery that Pfister gave in the police report certainly lends credence to Garrison's con-

or something like that. (Emphasis added.)

Record on Appeal, Vol. I, pp. 201–202. Because of the unclarity of Mr. Pfister's testimony, it is impossible to say that he was contradicting his earlier statements to the police. Consequently, it cannot fairly be said that the prosecution knew, or should have known, about any inaccuracies in Mr. Pfister's trial testimony.

2. For purposes of the prosecution's duty to disclose evidence favorable to the defense, the prosecutor need not have possessed the evidence if it was in the custody of government agents, including the police. *Smith v. Florida,*

5 Cir. 1969, 410 F.2d 1349, 1351; *Barbee v. Warden, Maryland Penitentiary,* 4 Cir. 1964, 331 F.2d 842, 846. See Comment, *Brady v. Maryland and the Prosecutor's Duty to Disclose,* 40 U.Chi.L.Rev. 112, 124–125 (1972).

3. Garrison's alleged partner in the crime has never been apprehended.

4. At the evidentiary hearing conducted in response to Garrison's state petition for habeas corpus, the prosecutor who tried Garrison's case testified that he thought Garrison's alibi witnesses were credible. Record on Appeal, Vol. I, pp. 149–150.

tention that he was absent from the scene of the crime. Consequently, I believe that the police report would have been useful not only for impeachment purposes, but would have enhanced Garrison's substantive alibi defense as well.

The notion that a witness's prior inconsistent statements may constitute substantive exculpatory evidence, in addition to being useful for impeachment, is not a new one. In *Giles v. Maryland*, 1967, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737, a suppressed police report contained statements that were inconsistent with the prosecutrix's testimony at trial concerning whether a certain defendant had raped her. Justice Brennan, speaking for a plurality of the Court, found that this evidence went "not only to the credibility of the State's witnesses, but also to the issue at trial whether [the defendant] had raped the girl". 386 U.S. at 77, 87 S.Ct. at 798–99, 17 L.Ed.2d at 746. See also *Alcorta v. Texas*, 355 U.S. 28, 31–32, 78 S.Ct. 103, 105, 2 L.Ed.2d 9, 12. This circuit reached a similar conclusion in *Davis v. Heyd*, 5 Cir. 1973, 479 F.2d 446. *Davis* involved the nondisclosure of a statement given by one of the witnesses to a shooting, shortly after the event, that contradicted his trial testimony with respect to when the defendant drew his gun. We found that the prosecution's failure to disclose the prior statement required a reversal of the conviction because the statement "specifically corroborated [the defendant's] defense of accidental discharge and specifically contradicted the [prosecution witness's] trial version of intentional killing in the heat of a struggle". 479 F.2d at 453.

Even if the prosecution's duty to disclose impeaching evidence should be governed by a more stringent materiality standard than its obligation to reveal exculpatory matter, I cannot agree that the stricter standard should be applied in a case, such as this one, where the undisclosed evidence is both exculpatory and impeaching. Characterization problems similar to the one in this case

will undoubtedly arise whenever the evidence undisclosed by the prosecution involves a statement by an important prosecution witness that conflicts with his testimony at trial. Thus, the distinction the majority draws between exculpatory and impeaching evidence, for purposes of prosecutorial disclosure, is not only unnecessary; it is largely unworkable.

### III.

In determining whether "the omitted evidence creates a reasonable doubt that did not otherwise exist"—the standard of materiality that I believe should be applied in this case—the Court in *Agurs* insisted that "the omission must be evaluated in the context of the entire record". —— U.S. ——, ——, 96 S.Ct. at 2402, 49 L.Ed.2d at 355. This is precisely what the district judge did in reaching the conclusion that a reversal of Garrison's conviction was necessary.

> Even under a stringent standard of materiality, the victim's inconsistent description of the robbers contained in the police report is so pertinent to his credibility at trial that its nondisclosure requires a reversal of the petitioner's conviction. The only positive identification of Garrison was made by Pfister, the victim of the armed robbery. Pfister's description of his assailant made the day following the crime and contained in the police report is of a man some 8" taller than Garrison. Without the benefit of this prior inconsistent description, the defense was unable to successfully impeach Pfister's testimony, *which was crucial to the State's case.* . . .
>
> . . . . . It is enough to say that the two descriptions, inconsistent on their face, would provide the defense counsel with ample grounds to attempt to impeach Pfister's testimony. *Such impeachment, if successful, would have been fatal to the State's case.* (Emphasis added.)

These findings are more than amply supported by the record and should not be disturbed.[5]

---

5. The prosecutor who tried Garrison gave the following testimony at the state habeas evidentiary hearing.

Q. Does that inconsistency [in Pfister's descriptions of his assailant] support your case?

I wish to stress that the Court's decision still leaves Garrison free to assert that the undisclosed police report was sufficiently material to entitle him to a reduction in punishment. *Brady v. Maryland*, 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. The 99-year sentence imposed on Garrison, the maximum under Louisiana law,[6] apparently was a product of Pfister's unequivocal trial identification of Garrison as the robber who bludgeoned him with a shovel. A doubt cast on the truth or correctness of Pfister's testimony might have resulted in a far shorter prison term for Garrison.

The Court today formulates a severe materiality standard to govern the prosecution's duty to reveal impeaching evidence, and denies the petitioner here relief, because it fears that "forcing disclosure of impeachment matter may actually inhibit a full presentation to the trier of fact". 540 F.2d at 1274. Even if this were true, the concern is misplaced in a case, such as this one, where the impeaching evidence comes into the prosecution's hands in the normal course of its investigation, and goes solely to the witness's recollection and perception of events rather than to his honesty and veracity. To the extent that the Court's fear is well founded, the materiality standard announced by the Supreme Court in *Agurs* is strict enough to combat the problem. No need exists to impose on prosecutors, the district courts, and ourselves the burden of drawing the often ethereal distinction between exculpatory and impeaching evidence. Under the *Agurs* materiality standard, Garrison is clearly entitled to the relief granted by the district court. I would therefore affirm.

A. Would it have supported it; no. It would have been contradictory, the inconsistency about what the victim allegedly stated to officer Schneider. It was—Ran [sic] completely counter to what was testified to at the trial, and what Mr. Pfister indicated the facts were when I saw him. . . .

. . . .

Q. Mr. Marcal, as a prosecutor do you consider the inconsistency there to be material?

A. Well, if it would have been directly brought to my attention, I think it would have been material; it would have been very material had it been brought to my attention.

Q. And as I recall, it's your testimony that you have no independent recollection of that inconsistency coming to you?

A. No it doesn't, other than the feeling that—a general feeling about this case. It started with Officer Favolora in the hallway, that he had better do some work on it, that the recollection of one person perhaps wasn't sufficient.

Record on Appeal, Vol. I, pp. 145–46, 148.

