The UNITED STATES

v.

Cary Glenn BLALOCK and Michael Eugene Fiedler.

Crim. A. No. 75–368A.

United States District Court, N. D. Georgia, Atlanta Division.

April 21, 1978.

See also, 5 Cir., 575 F.2d 1151.

Sherman D. Johnson, Asst. U. S. Atty., Atlanta, Ga., for plaintiff.

Ralph Washington, Federal Defender Program, Atlanta, Ga., Gene Burkett, Conyers, Ga., Eugene A. Medori, Jr., Decatur, Ga., for defendants.

## ORDER

RICHARD C. FREEMAN, District Judge.

Defendants Cary Glenn Blalock and Michael Eugene Fiedler, movants herein, were convicted in this court on March 30, 1976,

on three counts: conspiracy, 21 U.S.C. § 963; possession with intent to distribute, 21 U.S.C. § 841(a)(1); and importation, 21 U.S.C. § 952(a), of cocaine, a Schedule II narcotic controlled substance. Their convictions were affirmed on all counts by the Fifth Circuit Court of Appeals, *United States v. Blalock,* 564 F.2d 1180 (5th Cir. 1977). The appellate court, however, retained jurisdiction and remanded the action to the trial court on defendants' new trial motions. Defendants' motions grounded on newly-discovered evidence, were prompted by the Government's post-trial discovery and production of certain material from its files which it admits should have been furnished to defendants under the Jencks Act, 18 U.S.C. § 3500, and Rule 16, Fed.R. Crim.P. The material in issue consists of: (1) a transcript of the August 22, 1974, grand jury testimony of Howard Emerick, the Government's informant and primary witness against Blalock and Fiedler; and (2) a tape recording of a January, 1974, telephone conversation between Blalock who was in Ecuador and Emerick who was in Atlanta, Georgia. An evidentiary hearing was held before this court on March 2 and 3, 1978, and the parties have now submitted written arguments in support of their analyses of the evidence. Before proceeding to the merits of the new trial motions, a brief history of the disclosures and a recital of the respective arguments are warranted.

The Government explains that its failure to furnish this material may be attributed, in part, to the confusion of office reorganization preceding the Blalock and Fiedler trial. At that time, original transcripts of grand jury proceedings were only chronologically indexed in a central file and thus not readily retrievable once filed. A single copy of each transcript was routinely maintained in the case file. The case file covering this continuing conspiracy indictment was transferred through a succession of Assistant United States Attorneys and any

recollection of the appearance of Emerick before the grand jury faded in the shuffle. The original transcript was later inexplicably found in the 8-inch accordian case file by the Assistant assigned to the subsequent prosecution of a third co-conspirator, Eduardo Meïja. Testimony of Robert A. Boas, AUSA.

The taped telephone conversation, on the other hand, was discovered by chance by Mr. Boas when he played the "flip side" of a tape cassette used in the *Meija* trial. One side of the cassette was labelled with the pertinent *Meija* conversation which it carried, while the other side of the cassette was unlabelled and the tape within presumed to be blank. It was only upon this chance exploration of the *Meija* evidence that the Blalock-Emerick conversation was discovered as none of the Drug Enforcement Administration [hereinafter the "DEA"] agents' reports referenced the recording.[1] The recorded speakers were identified to Mr. Boas by Emerick, the Government informant who had made the recording.

The United States Attorney's office elected to present the fact of their discovery of the undisclosed material to the appellate court in the first instance. The Fifth Circuit Court of Appeals has, in turn, remanded the question for our present findings and conclusions.

Upon this history, the Government contends: (1) that its omission of this material was inadvertent, or negligent, at worst; (2) that the information contained in the undisclosed material was otherwise available and yet ignored by the defendants; and (3) that the effect of the undisclosed material is insignificant or *de minimus* when evaluated against the defendants' "overwhelming evidence of guilt." *United States v. Blalock,* 564 F.2d at 1183. The Government argues therefore that a different verdict could not be expected upon production of the material and that the defendants' motions should be denied.

---

1. In his testimony before the grand jury on August 22, 1974, Emerick disclosed the fact that he had taped conversations with Blalock who was in Ecuador and that he turned these tapes over to the DEA. Grand Jury Transcript at 22. The Government's failure to have the grand jury transcript in hand put this lead to possible tape recordings out of reach.

The defendants characterize the unreleased material as exculpatory and rightfully available under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Blalock contends that the taped telephone conversation corroborates his testimony, refutes Emerick's testimony, and independently establishes defendant's entrapment defense.[2] Fiedler asserts a derivative exculpatory claim based on the taped conversation. The only testimony against Fiedler was offered by Emerick whose credibility, it is contended, is drawn fatally in doubt by this disclosure. Both defendants assert that Emerick's grand jury testimony opens various avenues to further impeachment of the Government's informant. They contend that if the Government's withholding of the material was not by design, it was at least the result of gross negligence in the prosecutor's office. Upon all of these contentions, the defendants request that their new trial motions be granted.

■ Consideration of the merits of defendants' motions must begin with selection of the applicable standard of review. Distinct standards of review are applicable if the unfurnished material is exculpatory within the meaning of *Brady v. Maryland, supra,* or if it is simply discoverable under the Jencks Act or Rule 16, Fed.R.Crim.P. If the material is exculpatory and thus constitutionally compelled, the Government's negligence or design will not be in issue, as will be the case if the material is simply discoverable by statute or procedural rule. *Compare United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) *with United States v. Augenblick,* 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969) *and United States v. Bryant ("Bryant I"),* 142 U.S.App.D.C. 132, 439 F.2d 642 (1971). A threshold decision characterizing the tape and the grand jury testimony as either *Brady* or Jencks Act and Rule 16 material, is therefore required.

■ The court finds that the taped telephone conversation and the grand jury testimony constitute exculpatory material. The "character of the evidence, not the character of the prosecutor . . . ," *United States v. Agurs, supra* at 110, 96 S.Ct. at 2400, may then be dispositive of defendants' new trial motions. The tape tends to exculpate Blalock as it directly supports his entrapment defense. It impeaches the credibility of Emerick whose testimony condemned both Blalock and Fiedler. The grand jury testimony offers a wealth of impeachment material to both defendants' attorneys. Whether the material relates to the merits of Blalock's defense or to the credibility of the Government's informant, it is exculpatory in nature and should have been furnished to defendants under *Brady v. Maryland, supra.*[3]

■ Once the material is characterized, the court must then classify the circumstances presented under the three possible situations posed in *United States v. Agurs, supra,* either as: (1) an instance of uncorrected perjured Government testimony, exemplified by *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935); (2) an instance of a particularized request for exculpatory matter, exemplified by *Brady v. Maryland, supra* ; or (3) an instance of a generalized request or no request for exculpatory material, exemplified by *United States v. Agurs.* Although Blalock filed a duly-supported motion seeking discovery and production of evidence favorable to defendant and Fiedler apparently orally re-

**2.** Both Blalock and Fiedler raised strenuous and continuing allegations of entrapment throughout the trial. *See* Trial Transcript Vol. I at 33; Vol. III at 139–49 and 228–34; Vol. IV at 30; Vol. V at 35 and 155–64; and Vol. VI at 18 and 41.

**3.** The grand jury testimony of Emerick may also be classified as Jencks Act, 18 U.S.C. § 3500, material and thus need not have been furnished to the defendants until the infor-

mant's testimony at trial. *United States v. Scott,* 524 F.2d 465, 467–68 (5th Cir. 1975). This possible dual classification of the material affects only the timing of its production; it does not alter the nature or quality of the evidence. The material remains exculpatory in character and thus undeniably available to defendants. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

quested such material of the Assistant United States Attorney, these petitions may only be categorized as "generalized requests." *Cf. Brady v. Maryland, supra,* ["specific request" by defendant for statements of Brady's accomplice, Boblit, which were withheld by the prosecutor.]

■ Thus, the third standard pronounced and applied in *United States v. Agurs, supra,*[4] must be used, that is, whether the undisclosed material in this action "creates a reasonable doubt which did not otherwise exist . . . ." *Id.* at 112, 96 S.Ct. at 2401. The Fifth Circuit Court of Appeals has further refined the *Agurs* standard to limit its use to material relevant to the merits of a defense rather than to impeachment of a witness' credibility. If the nondisclosure is impeachment material, the Fifth Circuit counsels application of the new trial standard. *Garrison v. Maggio,* 540 F.2d 1271 (5th Cir. 1976), *cert. denied,* 431 U.S. 940, 97 S.Ct. 2655, 53 L.Ed.2d 258 (1977). These standards must measure the materiality of the undisclosed tape and grand jury testimony,

> in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

*United States v. Agurs, supra* at 112–13, 96 S.Ct. at 2402.

■ Measuring the materiality of the withheld grand jury testimony, using either the new trial standard for impeachment material, *Garrison v. Maggio, supra,* or the generalized request for *Brady* material standard, *United States v. Agurs,* the defendants' motions must fail. The trial record substantially parallels the grand jury's inquiry. Emerick's testimony at trial varies somewhat from his grand jury testimony but no more than it strayed from his signed statement and his reports to the DEA agents which had been properly produced.[5] The defendants' counsel emphasized the available discrepancies at trial, yet the jury returned verdicts of guilty. The court concludes that the grand jury testimony of Emerick is cumulative and is as inculpatory as it is exculpatory to defendants.[6] *See United States v. Crisp,* 563 F.2d 1242 (5th Cir. 1977).

■ On the other hand, evaluation of the materiality of the undisclosed taped telephone conversation prompts another result.[7] The telephone recording is neither cumulative, as the Government urges, nor is it peripheral, as in *United States v. Crisp, supra.* On the contrary, the taped conversation refutes the very essence of Emerick's testimony while it supports defendant Blalock's defense of entrapment and bolsters defendant Fiedler's attack on the informant's credibility.

---

4. The Supreme Court took care to distinguish the *United States v. Agurs* standard from the Rule 33 new trial standard of whether a different verdict would have been returned, *United States v. Cravero,* 536 F.2d 637 (5th Cir. 1976). The distinction is drawn because in the third *Agurs* situation of an unsatisfied *Brady* request, it is the prosecutor who has withheld the material in question, while under Rule 33 a neutral third-party has held the now newly-discovered evidence. Having drawn the distinction, the effective difference in standards appears to result because the *Agurs* standard is read in the mind of the trial judge while the Rule 33 standard is speculated in the minds of the jury. *United States v. Agurs,* 427 U.S. at 117–19, 96 S.Ct. 2392 (Marshall, J., dissenting).

5. *E. g., compare* Emerick's denial of any previous reference to Mafia money at trial, Trial

Transcript Vol. III at 64–65, *with* his admission of such reference, Statement of Jan. 31 and Feb. 11, 1974, at 1 *and* Grand Jury Transcript at 26.

6. *E. g.,* Emerick at first identified Blalock's partner as Tony Benefield, Grand Jury Transcript at 7, but later detailed the Waffle House meeting and incriminatory conversation with Blalock and Fiedler, *Id.* at 22–23.

7. The court listened to the tape and reviewed the transcript of the conversation in order to arrive at this evaluation of materiality. Buttressing this evaluation is the recognition that it is Emerick, the one who is harmed by the tape, who made the recording, and it is Blalock, the one who is aided, who was unaware of the taping.

Emerick's trial testimony depicts him as a legitimate lumber entrepreneur who under the auspices of the DEA allowed defendant Blalock to accompany him to Ecuador in search of lumber samples. Emerick testified that he merely observed and reported Blalock's South American activity and scheme to import the later-seized cocaine. Blalock, at trial, described himself as an unsuspecting, potential employee in Emerick's lumber business. He further claims that Emerick entrapped him into bringing the hollowed log samples back into the country. Emerick testified that defendant Fiedler had arranged for distribution of the imported cocaine while Fiedler testified that he was simply paid to pick up a crate of wood samples at the airport. These differing roles are directly or derivatively affected by the revelations in the taped telephone conversation.

The taped conversation of the telephone call to Emerick in Atlanta from Blalock just prior to his departure from Ecuador, appears to relate a report to an experienced principal from his fledgling agent. While the nature of their business may be disguised, their relative experience and status are not in doubt in the following excerpts:

BLALOCK: Hello.

EMERICK: Hey, God Damn, Where in the hell you been boy?

BLALOCK: Everywhere, everywhere, I've been pick'n up these wood species for you.

EMERICK: Oh, did you get the wood species?

BLALOCK: I finally got em. . . .

. . . . .

BLALOCK: Now look I'm going, ah, I'm going, ah, you want me to ship this stuff COD by Braniff?

EMERICK: Glenn, ship it to me, my name but pay for it. Do you have the money?

. . . . .

EMERICK: Pay for it but ship it to me, have Eduardo pay for it in Sucres and use Quantum Trade International and uh tell Eddie to use a local address there, any address.

BLALOCK: Okay. Okay, well uh. Well now they they said the samples would be in in three days now I know you want to get these things in and out.

EMERICK: Yeah, I need to get them things tested.

BLALOCK: Well that's what I know. We've got, I tell you we went around we we thought we was going to have to go to Esmeralda today but we didn't do it so we found some we had to go all over the place to get the samples so that you could get the okay on—

EMERICK: Okay make sure that the samples are packed uh, uh, protected because they go to go through several stress tests and stuff Glenn.

BLALOCK: Well what kind of protection you want put in them?

EMERICK: Well in a crate you know, make sure they are packed in a good heavy duty crate.

BLALOCK: Well it's in a heavy duty crate and uh each one of these things is going to be uh labelled as you said to do with the—

EMERICK: Yah each species of wood should be tagged uh either labelled or color coded.

BLALOCK: Well they're color coded, we got the five species that you, you wanted and we've got three different types of each one of them, uh so that you can make your choices. Fifteen different woods altogether.

EMERICK: Okay, great.

. . . . .

EMERICK: What time you leav'n in the morning?

BLALOCK: I leav'n about 10:30 in the morning, I tell you what, I've really had to work to get this stuff situated and set up this wood, this wood end of it, I know you're try'n to teach me the trade, but still it's it's a hassle it's are so many of them runn'n around,

EMERICK: Yah. Okay then uh, you want uh—.

The tape may fairly be read to provide the corroboration lacking in Blalock's claim of entrapment and to present further injury to Emerick's credibility with regard to Fiedler.

The unfurnished tape satisfies the *Agurs* materiality test as to Blalock and the *Garrison v. Maggio, supra,* refinement of that test as to Fiedler, when measured against the total fabric of the trial record. The appellate court in affirming the defendants' convictions, described the evidence against Blalock as "overwhelming."[8] *United States v. Blalock,* 564 F.2d at 1183. The tape recording, however, appears to unsettle the very foundation of the Government's case against Blalock. The court does not find that this evidence is unrebuttable or unimpeachable at a later trial, but rather decides that it raises a "reasonable doubt that did not otherwise exist . . . ." *United States v. Agurs, supra* at 112, 96 S.Ct. at 2401. The motion for a new trial of defendant Blalock must therefore be GRANTED.

■ The effect of the taped conversation on Fiedler's defense is admittedly indirect. However, the Government's case against Fiedler was "weak" and barely survived a motion for acquittal at the close of the evidence. Trial Transcript, Vol. 5, at 156. The prosecution of Fiedler relied heavily, if not in whole, upon the perceived credibility of Emerick. That credibility has now been substantially diminished. Measured in this context, the unreleased tape appears to create the reasonable doubt previously lacking and to suggest that his prosecution may very well have resulted in acquittal. *United States v. Agurs, supra; Cannon v. Alabama,* 558 F.2d 1211 (5th Cir. 1977). Again, the court does not pretermit the Government's possible mitigation of the tape at a retrial of Fiedler; we merely find that in view of the entire record the tape satisfies the applicable tests of materiality. *United States v. Agurs, supra; Garrison v. Maggio, supra.* Defendant Fiedler's motion for a new trial is accordingly GRANTED.

8. It may be noted that Emerick's flagging credibility may account for the fact that the later trial of Eduardo Meija, a third co-conspirator, resulted in a hung jury and in the court's subse-

Because the court has decided the defendants' motions under the *United States v. Agurs* and *Garrison v. Maggio* standards for exculpatory material, we need not proceed to an evaluation of the Government's conduct weighed against the character of the Jencks Act or Rule 16 discovery material. *United States v. Bryant, supra; Armstrong v. Collier,* 536 F.2d 72 (5th Cir. 1976). The court, however, will take this opportunity formally to recognize the exemplary conduct and approach taken by the Government once the unfurnished material was uncovered in the case file. The United States Attorney William L. Harper and his assistants: Sherman D. Johnson, Jeffrey D. Bogart, and Robert A. Boas, upon discovery of the material proceeded with remarkable forthrightness and clarity of purpose. There is no question that the Government bore the duty of presenting this material, but their able shouldering of this duty merits its commendation.

Accordingly, the court has GRANTED the motions for a new trial of defendants Blalock and Fiedler.

IT IS SO ORDERED.

quent entry of a judgment of acquittal. *United States v. Eduardo Meija,* Cr. No. 75–368 (N.D.Ga. Feb. 25 and 28, 1977).