Robert MAINS, Petitioner,

v.

Fred BUTTERWORTH et al.,
Respondents.

Nos. 79–1463, 79–1469.

United States Court of Appeals,
First Circuit.

Argued Jan. 10, 1980.

Decided March 10, 1980.

Harvey A. Schwartz, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Stephen R. Delinsky, Asst. Atty. Gen., Chief, Crim. Bureau, and Barbara A. H. Smith, Asst. Atty. Gen., Chief, Crim. App. Section, Boston, Mass., were on brief, for Fred Butterworth, et al.

Robert L. Sheketoff, Boston, Mass., with whom Norman S. Zalkind, Boston, Mass., by appointment of the Court, and Zalkind & Zalkind, Boston, Mass. were on brief, for Robert Mains.

Before ALDRICH, CAMPBELL and BOWNES, Circuit Judges.

ALDRICH, Senior Circuit Judge.

Defendant Robert Mains, petitioner for habeas corpus, was found guilty by a jury of first degree murder. We embark on the fifth inquiry whether there was an unconstitutional failure by the prosecution to fulfill its general obligation, *United States v. Agurs*, 1976, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342, to supply exculpatory evidence relating to its witness Edward Short. The question was raised initially by motion for new trial. The superior court denied the motion; the Supreme Judicial Court affirmed, *Commonwealth v. Mains*, 374 Mass. 733, 374 N.E.2d 576; a United States magistrate recommended that the writ of habeas corpus be granted, and the district court adopted the recommendation. The Commonwealth appeals.

The trial judge having died, the motion for new trial was heard by another judge. His one page memorandum of denial omits many facts and misstates others. With due

respect, the first adjective in the Supreme Judicial Court's conclusion that the "appraisal by the motion judge was thorough and entirely reasonable" was quite undeserved. Whether the second characterization is supportable requires an extensive survey.

To summarize, defendant complains of the following conduct by the Commonwealth. (1) Failure to list Short among its prospective witnesses. (2) Failure to disclose a police interview with Short soon after the killing. (3) Failure to disclose a report of a later interview by the investigator, and the content of interviews immediately prior to trial. The Commonwealth replies as follows. (1) The decision to use Short was made only at the last moment. How this excuses nondisclosure does not appear. (2) The prosecuting officer had not been told of the initial interview with Short. However, whether failure to disclose the state's evidence amounts to a constitutional violation is determined by the substance of the evidence, not by the prosecutor's personal knowledge or good faith. *United States v. Agurs*, ante. (3) The undisclosed evidence went only to impeach Short, and was cumulative or unimportant in any event. This is the nub.

On October 2, 1973, construction work was underway on Lenox Street in the Roxbury section of Boston. All day a heavy crane attracted onlookers. These included Sylvester Jones. In the afternoon Jones was shot and killed by three shots from a .38 revolver. Although a number of persons saw part of the event, only Short testified to the actual shooting. Since the omitted evidence allegedly would have served to impeach Short, we begin by considering what would have been the Commonwealth's case without him.

Lafayette Neal testified that he arrived at the scene about 2 o'clock; that this was the first time he was there that day; that several onlookers were there, including Jones; that they were drinking; that defendant arrived shortly thereafter; that

Jones then reached into an automobile and backed out with a handgun; that defendant drew a pistol, and after Jones emerged "he" spoke; that everybody took off; that the witness turned and ran as far as a fence, and saw nothing further, but heard several shots; that one shot struck him; that he saw defendant walk away, and that he told defendant he was shot. On direct examination it was unclear whether by "he" the witness meant it was defendant, or Jones, who spoke initially, but on cross-examination he testified that defendant never spoke. He did not know what Jones said.

Homer Johnson testified that he was working in the hole, and that he heard shooting and saw Jones fall. He went for the police. He did not recall seeing defendant.

A police officer testified that he found Jones lying on the sidewalk with a .22 automatic in his hand. The automatic was introduced into evidence. It had eight live cartridges. The record does not show how many more it could have held, but the officer testified that he searched the area and found no casings, which would automatically have been ejected upon firing. A ballistician testified that Jones had been hit by three .38 revolver bullets.

Defendant testified that he was not at the site in the morning; that when he arrived in the afternoon and was talking with Neal he saw Jones; that he had never spoken to Jones, but knew who he was; that he saw Jones reach into an automobile and turn around with a .22; that it was not the one in evidence; that he, the defendant, pulled an unloaded .25 pistol from his belt; that he was shot in the leg; that everyone knew he was shot; that he now had two spots on his leg as scars from his wound;[1] that Neal was shot, too; that he and Neal were hemmed in by the fence; that more than five or six shots were fired; that he did not see anyone shoot; that Jones was lying on the sidewalk; that he did not shoot Jones; that he walked off and threw his gun away; that because of his bloody leg he

1. Defendant made no offer at trial to show these spots. Hence the jury had no opportunity to determine their appearance, age, etc. Defendant had had a checkered career.

was given two rides, by strangers, to his sister's home; that it was not safe for him to go to any hospital because of Jones' gang; that his sister nursed his leg, and that she was now in the hospital.

Thomas Stall testified that most of the morning he was at a pool room, but he spent a couple of minutes on Lenox Street; that defendant was not there at that time; that he and defendant were there in the afternoon; that he saw Jones emerge from the car with a weapon; that he did not see defendant with one; that everyone ran; that he heard shots fired; that he didn't stand around to find out who was shot, and that he had talked with defendant since, but had never heard of defendant being shot.

Pausing here, we have a singular situation. There is not a scintilla of a suggestion where the .38 calibre bullets came from, or who shot Jones, if defendant did not. While defendant claimed that he, too, had been shot, and that everyone knew it, no one appeared to know it, and not even defendant knew who shot him. No one corroborated any of defendant's testimony, other than that Jones obtained his gun first. Defendant argued to the jury that it would be speculative to say that he was the actor. On this record, regardless of who got to his gun first, we think the shoe is on the other foot.

There would seem to be three choices: self-defense, murder without premeditation, and murder with premeditation. The evidence that Jones was the first to reach for his gun might have set the stage for a claim of self-defense, but defendant plainly rejected such a claim. Not only did he not so testify, but a self-defense concept could not surmount the discrepancy between an unloaded .25 and a .38. Moreover, the shooting of three bullets into Jones and one into Neal by a man who began firing as soon as he saw a gun seems exceptionally quick on the trigger if tested as defense-inspired. This was not a Western saloon, but mid-afternoon on a populated street where there was no apparent reason for anyone to expect to be shot.

Manifestly there was some prior history. After contending that defendant and Jones were strangers to one another, defendant's counsel put it to the jury, "Why in the world should Mains either try or actually shoot a stranger? The only answer I suggest is that he didn't." There are two sides to that coin. The fact is that Jones did reach for his gun when defendant appeared; they could not have been strangers. With no contemporaneous explanation, the only reasonable conclusion is that either they were both gunning for each other, or one had a known motive and the other was seeking to defend himself. With defendant by his own testimony eliminated as a defender, the answer follows: defendant must have had the motive as well as the firepower.

In this posture we turn to Short. On direct examination Short testified that defendant, whom he did not know, arrived on foot with his hand in his right pocket; that as defendant approached Jones, whom Short also did not know, he said, "I got my stuff, you got yours?"; that Jones started toward an automobile, but was shot by defendant before he reached it; that defendant's gun looked like a .38; that he did not see Jones with a gun; that defendant shot Jones three times, the third time when Jones was on the ground, and that when Neal said, "Don't shoot him no more," defendant shot at Neal twice, and Neal fell.

On cross-examination Short testified that he saw defendant at the site in the morning, drinking with Jones and others. On redirect he testified that defendant and Jones were drinking and laughing at first; that then they argued about Jones taking defendant's woman; and that, as he left, defendant said to Jones, "he was going home and he was coming back and he better have his 'stuff' and make sure his 'stuff' would shoot." Short testified that he was at the site both in the morning and the afternoon, sitting on the church steps across the street, observing, and that he remained there after the shooting.

The motion for new trial developed the following. Soon after the killing, either

that day or within two days, Short was interviewed by Sergeant Hudson, an investigating officer. It does not appear why this interview took place; no witness at the trial testified to Short having been at the scene.[2] Short was intoxicated, but conversable. He said he knew Jones, but was not sure whether he, Short, was there on the day in question. Hudson made no record of this, and did not, then or later, tell the prosecutor. He again interviewed Short in February 1974. His record of this conversation, so far as it went, was not significantly inconsistent with Short's testimony at the trial. However, it contained no account of any morning events, or of the follow-up remark in the afternoon, "I got my stuff, you got yours?" It also disclosed that Short was a heavy drinker. This led Hudson to tell the prosecutor that Short was "an alcoholic and undependable, as far as sobriety goes," for which reason it was concluded not to use him as a witness. Hudson's subsequent testimony leads us to believe that he did not mean he thought Short's testimony unreliable, but that he thought one could not count on his being sober.

The trial occurred in November 1974. Just prior thereto Hudson interviewed Short again. This proved a repeat of the prior interview, except that Short was sober and appeared no longer alcoholic. It was then decided to use him. The prosecutor then talked to Short for the first time, but like Hudson he did not learn of the morning argument or of defendant's afternoon remark. However, the record indicates that the prosecutor did learn that Short had been at the site in the morning. We assume, an assumption supported by the order of testimony, that since this interview occurred on the morning of trial the prosecutor, in his haste, failed to ask Short what had occurred.

Before considering the effect of the prosecution's failure to supply defendant with these pretrial facts regarding Short, we must resolve the question of what test is to

be applied. In *Agurs*, ante, the exculpatory evidence was substantive in nature, rather than impeachment material. The Court stated that the test was whether "evaluated in the context of the entire record" "the omitted evidence creates a reasonable doubt that did not otherwise exist." 427 U.S., ante, at 112, 96 S.Ct. at 2402. In this the Court rejected the ordinary new trial standard, applicable where the undisclosed evidence was not in the state's possession, which is whether that evidence "probably would have resulted in acquittal." *Id.* at 111, 96 S.Ct. at 2401. In *Garrison v. Maggio*, 5 Cir., 1976, 540 F.2d 1271, *cert. denied*, 431 U.S. 940, 97 S.Ct. 2655, 53 L.Ed.2d 258, the court held that this stricter standard should still apply where the undisclosed evidence in the state's possession was merely of an impeaching character. We have left this question open as recently as *United States v. Imbruglia*, 1 Cir., 1980, 617 F.2d 1, and still do so, but assume the lesser standard for the purposes of this case.

We have, therefore, two questions: the possible effect upon Short alone, and upon the case as a whole. As to Short alone, we are not as impressed as was the district court with the effect that the undisclosed evidence would have had upon his credibility. Intoxicated or not, he would have had to have been, literally, blind drunk not to be sure whether or not he had been present when at least four shots were fired and two men felled. We cannot think that if he was not there he had doubts and thought that perhaps he was. Rather, Short's originally asserted uncertainty indicated either the common unwillingness to get involved, or a desire to keep his options open. Hudson's return in February suggests that Hudson may have thought the former. Alternatively, Short would have kept his options open and come down the wrong way only for some purpose. There is no suggestion in the record that there was anything to cover for.

---

**2.** We note, however, that there was no affirmative basis for finding that he was not present. The district court erred by attributing to Neal

and Stall testimony that he was not there in the morning.

Evidence that Short may have been intoxicated[3] could well support an argument that he was mistaken as to who reached or obtained a weapon first. However, in addition to the fact that, for reasons we have stated, this does not seem a matter of ultimate importance, the jury already knew that Short was wrong in saying that Jones did not get to his gun. It could hardly be thought that the police, Neal, and Stall all erred in saying Jones had one. Hudson's recollection that Short said he "knew" Jones, if correct, did not indicate how direct was that knowledge.

As to the argument over Jones taking defendant's woman, and defendant's talk about "stuff," there simply had to have been some kind of past disagreement between the two men. If Short were making up a story, "stuff" would seem a peculiar ingredient; on the stand defendant indicated he did not know the usage. It seems far more reasonable to suppose that no one asked Short about the morning than to assume that he made up this story out of whole cloth. We add that we cannot read his testimony as a whole, particularly having in mind that court and counsel all agreed that he was a man of limited intelligence, without being struck with its uniform ring of truthfulness as he saw it.

Be that as it may, with regard to the ultimate question of Short's credibility, some reason to disbelieve him already existed. True, there was no impeachment of his testimony supplying a motive. However, the events themselves, quite apart from Short, revealed that there must have been one. What it was was unimportant. True, also, Short was the only witness to say he saw defendant shoot. However, defendant admits he was there, Neal saw a gun in his hand, and no other source of the shots has been suggested. Even with all the license of summation, prior defense counsel was unable to suggest any other source; nor has present counsel.

Doubtless having in mind *Agurs'* caveat that "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt," *Agurs*, ante, at 113, 96 S.Ct. at 2402, defendant argues, "Apart from Short, the prosecution's case was extremely weak." We do not agree. Like the Massachusetts court, looking at the evidence as a whole, we do not believe that the impeachment effect upon Short, and the effect upon the case as a whole of the full weight of the undisclosed evidence would have created a reasonable doubt that did not previously exist.

With respect to defendant's other points, we agree with the Massachusetts court and the district court that defendant had no complaint with the trial court, or with his former counsel, for the lack of a jury instruction on self-defense, nor has he any other substantial complaint against his former counsel. Basically the charge against the latter is only the all too common one of being unable to make bricks without straw.

*Judgment reversed, writ dismissed.*

---

3. The Commonwealth is mistaken in saying that, apart from Hudson, there was evidence at trial that he had been drinking.